James N. Bennett and Simone Bennett v. Commissioner.
Bennett v. Commissioner
Docket No. 83712.
United States Tax Court
T.C. Memo 1962-163; 1962 Tax Ct. Memo LEXIS 146; 21 T.C.M. (CCH) 903; T.C.M. (RIA) 62163; June 29, 1962
Martin M. Lore, Esq., 107 William St., New York, N. Y., for the petitioners. Edward H. Hance, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income *147 tax for the year 1955 in the amount of $12,815.56. The issue for decision is whether any portion of the net profits of Eastern Engineering Co., a partnership, for its fiscal year ended March 31, 1955, distributable to the S. G. Trust under the partnership agreement, should be included in petitioners' income for the year 1955 in determining their income tax. Findings of Fact Some of the facts have been stipulated and are found accordingly. James N. Bennett (hereinafter referred to as petitioner) and Simone Bennett (hereinafter referred to as Simone), husband and wife residing in Bronxville, New York, filed a joint income tax return for 1955 with the district director of internal revenue for the district of Upper Manhattan, New York, New York. In 1945 petitioners formed a partnership to engage in the rendering of engineering and technical services under the name of Eastern Engineering Co. Both partners originally worked full-time in the business, but Simone ceased such work in 1953 when her first child was born. On December 10, 1953, Samuel Grobart of Paterson, New Jersey, entered into a trust agreement with petitioner as trustee. Grobart, a cousin of petitioner, transferred *148 $12,500, and two other relatives of petitioner transferred $10,000 and $2,500, respectively, to the trust, which was designated the S. G. Trust. All of the funds received by the trust were deposited in a savings bank account under the name of S. G. Trust. At the time the trust agreement was executed, petitioner had one daughter, Vivienne Lee, born in July 1953. The trust agreement provided in part as follows: ARTICLE I Term of the Trust This trust shall last for the life of Vivienne Lee Bennett, daughter of James N. Bennett and Simone N. Bennett, unless sooner terminated. ARTICLE II Disposition of Income and Principal A. The net income from the trust fund shall be accumulated so far as lawfully permitted for the benefit of the said Vivienne Lee Bennett, or it shall be applied for her use or benefit, or paid to her, all in such manner and at such times as the Trustee, in his sole and uncontrolled discretion, shall deem appropriate or propitious for the general welfare of the said Vivienne Lee Bennett. B. Anything hereinbefore to the contrary notwithstanding, James N. Bennett, father of the said Vivienne Lee Bennett, shall have full power and authority at any time and *149 from time to time to divert any income from the said Vivienne Lee Bennett and appoint it to any other of his issue, be it by way of payment, application, or lawful accumulation, and in such shares and proportions among his issue, or all to any one of them, as the said James N. Bennett, in his sole and uncontrolled discretion, shall decide, and if the said James N. Bennett at any time or from time to time, in his sole and uncontrolled discretion, shall deem it a matter of parental wisdom that none of his issue shall be a recipient of income hereunder for any temporary or permanent period of the trust, then he shall also have full power and authority to appoint any income, in his sole and uncontrolled discretion, be it by way of payment, application, or lawful accumulation, to any other person or persons and in such shares and proportions among them as he may choose, with the exception that at no time may he appoint any income to himself, his estate, his creditors, or the creditors of his estate. C. To the extent that no prior termination, in whole or in part, has taken place pursuant to paragraph E of this ARTICLE I, upon the death of the said Vivienne Lee Bennett, or upon her attaining *150 the age of thirty (30) years, whatever event shall be the earlier, the trust fund as it may then exist shall be paid over and distributed to such person or persons and in such proportions and lawful estates as the said James N. Bennett may appoint, with the exception that such said power of appointment may not be exercisable by the said James N. Bennett in favor of himself, his estate, his creditors, or the creditors of his estate, and to the extent that the said James N. Bennett shall have failed, in whole or in part, to effectively exercise his said power of appointment then to the said Vivienne Lee Bennett if she shall then be living, and if she shall then not be living then per stirpes to the lawful issue then living of the said James N. Bennett, and if no such issue shall then be living then to the heir or heirs of the last to die of such said issue as if his or her death had occurred immediately after the death of the said Vivienne Lee Bennett and determined in accordance with the laws relating to intestacy of the State of New York at the time of the death of the said Vivienne Lee Bennett, the Settlor, any other person who may have contributed to the trust, and James N. Bennett, *151 excluded. D. Any power of appointment that James N. Bennett may have pursuant to the foregoing paragraphs B and C of this ARTICLE I may be exercised by him by an instrument in writing, which may be revocable or irrevocable (and which must be received by the Trustee), or by his Will duly admitted to probate. E. The Trustee shall be fully authorized and empowered, at any time and from time to time, to apply for the use and benefit of, or to pay or distribute, the whole or any part of, the principal of the trust to Vivienne Lee Bennett and any other person appointed as a recipient of income by James N. Bennett pursuant to paragraph B of this ARTICLE I as the Trustee, in his sole and uncontrolled discretion, may deem appropriate and advisable, with the express proviso that the Trustee may do so with or without apportionment among the persons hereinbefore mentioned, and that even all of the principal may be paid or distributed to any one of them. In making any application, payment, or distribution, out of principal as hereinbefore provided, the Trustee may, but need not, in his sole and uncontrolled discretion, take into consideration any other funds or resources any recipient of principal *152 may have. The judgment of the Trustee as to any such application, payment, or distribution, and the advisability thereof, shall be final and conclusive upon all persons interested or who may become interested hereunder, and upon making any such application, payment, or distribution, the Trustee shall be fully released and discharged from all further liability or accountability therefor. Petitioner as trustee was given broad investment and administrative powers with respect to the trust corpus, including the right to make loans to or borrow money from anyone on such terms as he deemed advisable. Petitioner, as trustee, could make payment to himself as parent for the benefit of his children and such payment would constitute full acquittance to petitioner as trustee. It was also provided that no payments from the trust could be made in discharge of any of petitioner's legal obligations. The agreement further provided that the trust was to be governed by the law of New York except that with respect to the accumulation of income the law of New Jersey should apply. With respect to succession of trustees, the agreement provided: ARTICLE VIII Succession of Trustee A. James N. Bennett *153 shall have the right to appoint any person, or a list of persons (individual or corporate), he may deem fit as successor or successors to him to the office of Trustee hereunder, and any such successor or successors may be either a sole Trustee or any number of Trustees, and with such division of powers and authority among the latter as the said James N. Bennett may appoint. James N. Bennett may exercise his said power of appointment by an instrument in writing which may be amended, canceled, or revoked, by him at any time or from time to time, or by his Will duly admitted to probate. Any appointee shall become Trustee hereunder upon the respective event specified in the appointment by signifying in writing his, her, or its, acceptance of the trust. B. James N. Bennett shall have the right at any time and from time to time to appoint any person (individual or corporate) he may deem fit to serve as a co-Trustee with him with full or restricted powers to act hereunder. C. In the event that James N. Bennett shall die, resign, or become incapacitated to act, without having effectively exercised his right to appoint a successor or successors, or no appointee shall be willing or able *154 to act as Trustee hereunder, then the Manufacturers Trust Company, having its principal office at present at 55 Broad Street, New York, New York, shall become Trustee hereunder. D. In no event shall the Settlor become Trustee hereunder at any time. E. No Trustee hereunder shall be required to give any bond or other security of any kind for the faithful discharge of his duties, any law to the contrary notwithstanding. F. The term "Trustee" wherever used in this agreement shall be deemed to mean any Trustee or Trustees for the time being in office, and any such Trustee or Trustees shall have the same rights, powers, duties, authorities and privileges, whether or not discretionary, as if originally appointed hereunder, which shall continue after the termination of the trust until final distribution. On April 1, 1954, petitioner, Simone, and the S. G. Trust, represented by petitioner, as trustee, entered into an agreement of copartnership to continue the business theretofore conducted by petitioner and Simone under the same name. The capital contribution by the partners was as follows: James N. Bennett
$40,000.00
Simone N. Bennett
$40,000.00
The S. G. Trust
$20,000.00
*155 The agreement recited that petitioner and Simone had been engaged in business during the last few years as partners under the firm name of Eastern Engineering Co. and that the two were desirous of admitting the S. G. Trust into their partnership. The agreement, calling for a partnership of the three, provided in part as follows: 6. The net profits of the partnership shall be divided and the net losses shall be borne by the partners as follows: James N. Bennett
40%
Simone N. Bennett
40%
The S. G. Trust
20%
7. Out of any net profits and prior to the division thereof in any fiscal year period there shall be paid: a. 5% interest per annum on the capital employed in the partnership from time to time; and b. A remuneration to James N. Bennett as managing partner equal to: 6% on billings up to $500,000.00; 4% on billings from $500,000.00 to $1,000,000.00; and 2% on billings of $1,000,000.00 and in excess thereof; always provided that James N. Bennett shall not receive as such remuneration more than 80% of the net profits of the partnership for the respective fiscal year period as established by the certified public accountant in charge of the auditing *156 of the books of the partnership. The partnership agreement further provided that bank accounts in the partnership name would be maintained with the right to withdraw funds upon the signature of any one of the partners; that each partner would render to the others accounts of money spent; that no partner should have the right to sell, assign, encumber or otherwise dispose of his interest in the partnership without the written consent of the other partners; that any of the partners could terminate the partnership upon 60-days written notice, and that upon termination or dissolution of the partnership an accounting should be made and petitioner should have the right to buy from any other partner or partners (who shall be obligated to sell) the interest of such other partner or partners in the partnership at book value to be determined upon such accounting without taking into consideration any goodwill. The agreement further provided that the firm name of Eastern Engineering Co. and the goodwill attached thereto would not be considered a partnership asset but would belong to and be the exclusive property of petitioner. A certificate of discontinuance of business as partners under the *157 name of Eastern Engineering Co. was filed by petitioner and Simone and a new trade name certificate filed with the County Clerk, New York County, showed as partners in Eastern, petitioner, Simone and the S. G. Trust. The customers were notified of the existence of the new partnership and who the partners were. In accordance with the partnership agreement $20,000 was paid into the enterprise by the trust. Eastern Engineering Co. (hereinafter referred to as Eastern) is a service type company providing industry with engineers, detail men, draftsmen and designers as the need for this type of personnel arises. Eastern gets business through contacts made by petitioner and others with large industrial enterprises such as Sperry Gyroscope and American Machine & Foundry. The arrangement made with customers is that Eastern will stand ready to supply such customers with a designated number of men skilled in the various categories at a set hourly rate per man, such workers to be available as needed by the customer. Under the arrangement the customer was not obligated to use the services of Eastern's employees other than as needed. The employees were paid a stated hourly wage by Eastern. Eastern, *158 in turn, billed its customers every week for the work performed by the employee or employees at an hourly rate previously agreed upon by Eastern and the customer. Petitioner's services were not billed to the customers. The number of Eastern's employees varied continuously but has been as high as 300. For its weekly pay period ending April 17, 1954, there were listed on the pay sheets 182 employees receiving an aggregate gross pay of $19,337.73 and in addition an unspecified number of other employees receiving total gross pay of $2,601.60. Eastern's total gross payroll during the fiscal year ended March 31, 1955, averaged about $18,000 per week. Eastern was required to pay its employees for the work they performed weekly but did not receive payment from its customers under their agreement until time tickets for the workers had been collected and approved and the customer billed, usually a period of from 2 to 3 weeks. Some customers did not pay Eastern immediately after receiving Eastern's bill but would wait 4 to 8 weeks to pay Eastern. Some accounts are not paid until 3 or 4 months after billing and one account remained unpaid for a year. Eastern's method of operations often necessitated *159 its obtaining bank loans to carry its accounts receivables. There was outstanding at the time the partnership was formed on April 1, 1954, a bank loan of $50,000. During the year ended March 31, 1955 petitioner was the general manager of the partnership. In accordance with the formula set out in the partnership agreement petitioner received a salary for the year of approximately $54,000. The range of salaries in comparable firms for services equivalent to those performed by petitioner was between $35,000 and $50,000. For purposes of renegotiation of Government contracts a salary of $50,000 a year was recognized for petitioner's services to Eastern. Petitioner himself contacted slightly over half the prospective customers during the year 1954. The balance of the personal contacts were made by other employees of the partnership. In 1954 Eastern had about 15 customers under contract. Eastern obtained the contracts mainly through personal contacts and through the company's reputation for doing good work. The following table shows the total assets and liabilities of the partnership and the equity of the partners for the dates indicated: Total Partnership
Partnership
Date
Assets
Liabilities
Partners' Equity
Dec. 31, 1949
$ 47,247.89
$ 2,239.91
$ 45,007.98
Dec. 31, 1950
66,758.17
5,293.72
61,464.45
Dec. 31, 1951
166,896.39
44,435.28
122,461.11
Dec. 31, 1952
236,968.22
93,924.39
143,043.83
Dec. 31, 1953
285,477.52
129,068.70
156,408.82
Mar. 31, 1954
248,392.19
111,399.77
136,992.42
*160 The following table shows the amounts of partnership net earnings and the amounts withdrawn by the partners for the years and period indicated: Partnership
Amount Withdrawn
Years
Net Earnings
by Partners
1949
$ 47,236.81
$ 54,778.41
1950
57,896.97
41,440.50
1951
144,687.14
83,690.48
1952
171,353.62
150,770.90
1953
175,032.59
161,667.60
1954 (Jan. 1-
Mar. 31)
57,683.60
77,100.00
The balance sheets of the partnership show fixed assets with a cost, a reserve for depreciation, and net value as of the dates indicated as follows: Reserve for
Total
depreci-
Net
Date
cost
ation
value
Dec. 31, 1952
$35,330.15
$12,351.88
$22,978.27
Dec. 31, 1953
53,347.81
21,886.76
31,461.05
Mar. 31, 1954
51,827.09
24,764.56
27,062.53
Mar. 31, 1955
50,119.68
35,841.22
14,278.46
Accounts receivable were shown on the partnership balance sheets for the dates indicated as follows: Accounts re-
Date
ceivable
Dec. 31, 1952
$105,496.40
Dec. 31, 1953
146,288.77
Mar. 31, 1954
127,869.33
Mar. 31, 1955
102,754.91
The partnership return of income for its fiscal year ended March 31, 1955, showed *161 the following: Total income
$1,236.166.09
Less: Salaries and wages
$931,631.11
Rent
34,622.80
Taxes
32,075.28
Depreciation
12,051.01
Other
83,144.74
1,093,534.94
Net income
$ 142,641.15
The net income of $142,641.15 was apportioned among the partners as follows: Petitioner
$90,165.13
Simone
35,467.98
The S. G. Trust
17,008.04
The partnership return of income for its fiscal year ended March 31, 1955 shows the capital accounts of the partners at the beginning of year, amount of partners withdrawals, and the capital accounts at the end of the year as follows: Beginning
End of
of year
Withdrawals
year
Petitioner
$67,954.41
$107,779.74
$50,191.80
Simone
69,038.01
10,145.07
94,212.92
S. G. Trust
36,934.04
On their income tax return for 1955 petitioner and Simone reported gross income of $124,339.72 and a tax due of $47,592.34. The income as reported on the return included dividend income of $2,374.55. The return showed 40 separate purchases of various stocks or stock purchase rights with an aggregate cost of $232,247.36, expenses of $11,598.24 in connection with breeding cows, *162 and charitable contributions totaling $21,046. The claimed deductions did not include any amount as interest paid. The following amounts were credited to the S. G. Trust capital account on the partnership records: 4/14/54
Partnership contribu-
tion
$ 20,000.00
3/31/55
Profit
16,934.04
3/31/56
Profit
25,215.27
3/31/57
Profit
33,701.77
3/31/58
Profit
16,882.20
3/31/59
Profit
40,779.48
3/30/60
Profit
12,541.44
3/31/61
Profit
9,493.85
$175,548.05
The following amounts of withdrawals from the trust's capital account were shown on the partnership records under the dates and for the purposes indicated: 2/ 2/56
Payment to beneficiary
$ 595.00
55
Payment 1955 Federal
Income Tax
5,370.70
55
Payment 1955 N. Y. St.
Income Tax
892.29
1956
Payment 1956 Federal
Tax
9,784.63
1956
Payment 1957 State Tax
1,499.58
5/ 6/57
Accounting fee
45.00
12/ 5/57
Payment to Beneficiary
11,000.00
12/ 6/57
Payment to Beneficiary
11,000.00
3/31/58
Accounting fee
45.00
3/31/58
Federal Income Tax
2,718.41
3/31/58
State Income Tax
616.18
12/31/58
Payment to beneficiary
10,000.00
3/31/59
Accounting fee
45.00
3/31/59
State Tax
331.43
12/31/59
State Income Tax
70.00
12/31/59
Beneficiaries
20,000.00
12/31/60
Payment to Bank Ac-
count
5,000.00
12/31/60
Accounting fee
50.00
$79,063.22
*163 Most of the earnings credited to the trust's capital account, other than the amounts distributed to or on behalf of the beneficaries, were reinvested in or loaned to the partnership. As of June 1961, the amount of $20,000 was in each of two custodian accounts for petitioner's two daughters, Vivienne and Dina, which amounts had been received as distributions from the trust. These custodian accounts are savings accounts which were currently earning 3 percent interest. Petitioner is connected with another company in the same type of business as Eastern which operates in California. That company had very slight losses for a number of years after it commenced business. Subsequently it had good earnings for a number of years and for the 3 years prior to June 1961 it had sustained losses in the neighborhood of $40,000 per year. Payments and distributions have at all times from the formation of the partnership on April 1, 1954, been made in accordance with the partnership agreement. Respondent in his notice of deficiency increased the income of the partnership by disallowance of certain deductions claimed on its return of income, which adjustments are not here in issue, and determined *164 that the proportion of such partnership net income stated to be distributable to the S. G. Trust in agreement dated April 1, 1954, should be included in petitioners' income with the following explanation: The understatement of $19,058.04 in your income is based on the determination that the S. G. Trust is not a partner in Eastern Engineering Co. within the meaning of Section 704 or Section 61 of the Internal Revenue Code of 1954. Moreover, it is determined that in the event participation by the S. G. Trust as a partner in Eastern Engineering Co. is sustained, the income thus distributable to the Trust is taxable in your return under the provisions of Section 674 or Section 677 of the Internal Revenue Code of 1954. Opinion Sections 3797(a)(2) and 191 of the Internal Revenue Code of 1939 contain the special provisions relating to family partnerships applicable to partnership years beginning prior to December 31, 1954. [1] Under the provisions of section 3797(a)(2) of the Internal Revenue Code of 1939, a person shall be recognized as a partner if he owned a capital interest in a partnership in which capital is a material income-producing *165 factor whether or not such interest was acquired by purchase or by gift. Under section 191 of the Internal Revenue Code of 1939, where the interest is acquired by gift, the distributive share of the donee is includible in his income except to the extent that it is determined without a reasonable allowance for compensation for services rendered by the donor and to the extent that a disproportionate share of the income is attributed to the donated interest. Under this section, the partnership interest acquired by the S. G. Trust is to be considered a donated interest. *166 In Henry S. Reddig, 30 T.C. 1382 (1958), appeal dismissed (C.A. 6, 1960), and Roy C. Acuff, 35 T.C. 162 (1960), affirmed per curiam 296 F. 2d 725 (1961), the legislative history of these sections dealing with family partnerships is discussed. In those cases we held that these provisions do not require the recognition of the donee as a partner where the gift or sale of the partnership interest is a mere sham and that particular scrutiny should be given to those cases where the donee partner is a trust for the benefit of a minor and the trustee is a donor whose accounts are not subject to judicial supervision. Respondent's primary position in the instant case is that the S. G. Trust was not a bona fide partner in Eastern. This is a question of fact to be determined from the evidence as shown by the legal documents relating to the creation of the partnership interest and the conduct of the parties in carrying out the plan set forth in such documents. Henry S. Reddig, supra; *167 Jack Smith, 32 T.C. 1261 (1959); and Roy C. Acuff, supra.Respondent contends that there was no conveyance of a partnership interest to the trust but only an assignment of income, that petitioner as trustee of the trust retained substantial control over the trust assets, that capital was not a material income-producing factor of the partnership, and even if capital was a material income-producing factor, there was no showing that the amount of partnership income attributed to the trust was appropriate. Petitioner contends that the trust received a full 20 percent interest in the partnership due to the trust's contributing 20 percent of the partnership's capital, that capital is a material income-producing factor of the partnership, and that any control petitioner had as trustee over the income and corpus of the trust was exercisable only in a fiduciary capacity for the benefit of his issue. The facts here show that the trust was created in 1953 upon the contribution by petitioner's relatives of $25,000 in trust. By the trust indenture petitioner was made trustee and given broad powers to invest, borrow, or make loans with the trust corpus. The named *168 beneficiary of the trust was Vivienne Lee Bennett with the power in petitioner, as trustee, to pay, apply, or accumulate the income for her benefit. Petitioner, by the power of appointment given to him by the trust instrument and the discretion granted to him as trustee, could divert the income and corpus to any other of his issue, either to be paid, applied, or accumulated for such other issue, and if petitioner in his sole and uncontrolled discretion, deemed it a matter of parental wisdom that none of his issue shall be a recippent, to appoint income and corpus to anyone he may choose other than himself, his creditors, his estate, or creditors of his estate. On April 1, 1954, a partnership agreement between petitioner, his wife, and the trust was entered into whereby the trust contributed $20,000 in cash to the partnership which amount constituted 20 percent of the contributed capital. In return for its contribution to the partnership, the agreement provided that the trust would share to the extent of 20 percent in the partnership profits remaining after payment to petitioner of compensation for services rendered. If on termination of the partnership petitioner elected to buy out *169 the interest of the trust, it would receive the amount standing to its credit in its capital account. Although the partnership agreement does not specifically cover the situation of a sale of the partnership to a third party, presumably, the trust would receive its proportionate share based on the amount standing in its capital account. Following the entry of the trust in the partnership, petitioner continued as general manager of the business. A business certificate for partners, showing the trust as a partner in the business, was filed with the County Clerk and Clerk of the Supreme Court, New York County. The customers of the business were notified of the presence of the trust as a partner in the business. From 1955 to 1960, partnership profits in the amount of $146,054.20 were credited to the trust's capital account. For the same period distributions to or on behalf of the trust amounted to $79,063.22. As of June 1961 there were custodian accounts with a balance of $20,000 for each of petitioner's two children. These accounts represented distribution from the trust and were in a savings bank earnings 3 percent interest. Other sums distributed to the trust had been used to pay *170 State and Federal income taxes and certain of the distributed funds had been loaned to the partnership business. Unquestionably, the legal documents here involved on their face constitute the trust a partner in Eastern. The actions of the parties as shown by the evidence confirm that the petitioner treated the trust as a bona fide partner. The facts in this case are similar to those in Jack Smith, supra, except that in the instant case, petitioner, under his power of appointment combined with his discretion as trustee, has the power to divert trust income and corpus away from his children and appoint them to others. Respondent contends that this power, along with petitioner's other powers as trustee to make investments and loans and to borrow from the trust corpus, gives petitioner virtual control over the trust corpus. The discretion granted to a trustee in disbursing income and corpus, even though broad, is not that illimitable potentiality which an unrestrained individual possesses respecting his own property. Corkery v. Dorsey, 223 Mass. 97, 111 N.E. 795 (1916). *171 "* * * no language, however strong, will entirely remove any power held in trust from the reach of a court of equity." Stix v. Commissioner, 152 F. 2d 562 (C.A. 2, 1945), affirming 4 T.C. 1140. The trust in the instant case was set up for the benefit of petitioner's children. Petitioner, as trustee, must act for and on behalf of his children as beneficiaries. Although a trustee may be granted broad discretion, the exercise of his discretion must be reasonable, in good faith, and consonant with the intent of the settlor. Cf. In Re Garfunkel's Will, 149 N.Y.S. 2d 130 (1956); Henderson's Will, 113 N.Y.S. 2d 319 (1952); Hayden's Estate, 105 N.Y.S. 2d 708 (1951); and 2 Scott on Trusts, sections 187, 187.2 and 187.4, Second Edition, 1956. Petitioner was permitted to appoint other recipients of income and principal when he deemed it a matter of parental wisdom to do so. Parental wisdom connotes that concern a parent has for the well-being of his child. Petitioner could not arbitrarily divert the trust corpus and income away from *172 his children nor act arbitrarily in the exercise of the other powers granted to him as trustee. Carvell's Will, 21 N.Y.S. 2d 376 (1940). All the powers granted to petitioner in a trust capacity are to be exercised for the interests of the beneficiaries and, as such, do not negate the bona fides of the transfer of the partnership interest to the trust so as to disqualify the trust as a partner in Eastern. Respondent cites Henry S. Reddig, supra, in support of his position. The Reddig case differs from the instant case in that there the trustee partner was directed to act in the interest of the partnership even though this would conflict with his duty as trustee and the donee partner's interest could be impaired by a provision in the partnership agreement permitting the partnership out of general funds to buy out the interest of deceased members and have the interest so purchased belong to the donors. In Henry S. Reddig, supra, one of the donor partners overdrew his capital account soon after the trust was made a partner. Respondent next contends that capital is not a material income-producing factor in the business of Eastern. Petitioner *173 points to the large accounts receivable Eastern was forced to carry in support of his contention that capital was a material income-producing factor. Petitioner calls attention to the fact that at times the partnership borrowed money which petitioner contends was for the purpose of carrying its accounts receivable. In holding in Jack Smith, supra, that capital was a material income-producing factor, it was pointed out that both inventory and accounts receivable of the business required capital. Petitioner herein testified that there was always a delay between the time that services were performed by the partnership's employees and the bills submitted to its customers and that many customers were slow in paying their bills when they were submitted. The evidence shows that the carrying of accounts receivable was a material factor in the production of the partnership's income. Respondent contends that petitioner's personal wealth was such that he could have financed the operations of the partnership without either borrowed capital or new capital had he chosen to do so. Petitioner contends that his personal funds were already to an appreciable extent tied up in the business *174 operations of Eastern. Whether petitioner could have used more of his personal capital for financing the partnership's business is not determinative of the issue whether capital is a material income-producing factor in that business. Respondent also contends that the portion of the profits allocated to the trust is too large because sufficient allowance is not made for the retention by petitioner personally of the goodwill of the business. The evidence shows that the goodwill of the business was to a large extent the personal goodwill created by petitioner as managing partner and that the compensation allowed for petitioner prior to the distribution of profits was adequate both for his services and the goodwill created by those services. Respondent argues generally that the profits received by the trust were out of proportion to the trust's investment in the partnership. From the capital accounts standing to the credit of petitioner and Simone at March 31, 1954, there is a suggestion of merit to this argument. However, the petition alleged that the capital contributed by the partners was *175 $40,000 each for petitioner and Simone and $20,000 for the trust and respondent specifically admitted this allegation in his answer and in the amendment thereto filed at the trial. This admission relieved petitioner of explaining what would otherwise appear to indicate that he and Simone each contributed in excess of $40,000 to the partnership formed on April 1, 1954. The distributable income of the trust and the distributions to it were large in relation to the trust investment. However, the evidence shows that Eastern's business is a hazardous one and the trust shared in the losses as well as in the profits. The distributable interest of each partner was determined in accordance with the partnership agreement which, after provision for petitioner's compensation for services, provided for proportionate distribution to capital contributed. We hold the trust to be a valid partner in Eastern. Respondent's final contention is that petitioner is taxable under section 674 of the Internal Revenue Code of 1954 because of the powers he has over the trust property. Section 674 of the Internal Revenue Code of 1954 relates to the grantor of *176 a trust. Petitioner, for the purposes of section 191 of the Internal Revenue Code of 1939, is considered the donor of the partnership interest to the trust, since that section specifically so provides. However, this provision is strictly limited to "the purposes of this section." Therefore, for the purposes of section 674 of the Internal Revenue Code of 1954, petitioner is not the grantor of the trust and that section is not applicable to him. Although reference is made to section 677 of the Internal Revenue Code of 1954 in the notice of deficiency as a basis of including the trust's portion of the distributable income from the partnership in petitioner's income, respondent on brief makes no argument based on this section. This section also applies to a grantor of a trust and is inapplicable to petitioner for that reason just as is section 674 of the Internal Revenue Code of 1954. Because of certain uncontested adjustments, Decision will be entered under Rule 50. Footnotes
1. Both respondent and petitioner rely upon section 704(e) of the Internal Revenue Code of 1954 but under the provisions of sec. 771(a), I.R.C. 1954, secs. 191 and 3797(a)(2), I.R.C. 1939 are applicable hereto. There is no substantial difference in the two. Sec. 3797(a)(2), I.R.C. 1939. * * * A person shall be recognized as a partner for income purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. Sec. 191, I.R.C. 1939↩. In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service. For the purpose of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trust for the primary benefit of such persons.