MELVIN P. KETTER AND MILDRED J. KETTER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1661–74.     Filed August 9, 1978.

*William J. Shapiro* and *Charles P. Schleicher,* for the petitioners.

*John Wendell Paul,* for the respondent.

WILBUR, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1968 | $6,842.90 |
| 1969 | 3,403.89 |
| 1970 | 254.57 |
| Total | 10,501.36 |

These deficiencies resulted from respondent's conclusion that a partnership between eight trusts established by petitioner, Melvin P. Ketter, should not be recognized for Federal income

tax purposes, and that the partnership income was taxable to him. The issue presented for our determination is whether the partnership should be recognized for Federal income tax purposes under section 704(e).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are Melvin P. Ketter (hereinafter petitioner) and Mildred J. Ketter (hereinafter Mildred), husband and wife, who resided at St. Joseph, Mo., at the time the petition in this case was filed.[2] Petitioners filed joint Federal income tax returns for the years 1968, 1969, and 1970 with the Internal Revenue Service Center at Kansas City, Mo. These returns were prepared on the cash receipts method of accounting.

Prior to December 21, 1968, petitioner maintained a certified public accounting practice with offices in St. Joseph and Chillicothe, Mo., in the form of a sole proprietorship. On December 16, 1968, he employed 16 persons in the conduct of this accounting practice.

Petitioner was an alumnus of St. Benedict's College and had taught courses there, with the assistance of his professional staff, in the areas of accounting and Federal taxation.

On December 21, 1968, Melvin created eight irrevocable, inter vivos trusts. These trusts were identified as "MPK Irrevocable Trust numbers 1 through 8." The beneficiaries of trusts numbers 1 through 6, inclusive, were petitioner's six minor children, with each child the beneficiary of a separate trust. The beneficiary of trusts numbers 7 and 8 was St. Benedict's College, Atchison, Kans., a charitable organization.

The initial trustee of all these trusts was Donald J. Gawatz (hereinafter Gawatz), a resident of St. Joseph, Mo., with 22 years of experience in accounting. Gawatz was Mildred's brother. The First National Bank of St. Joseph, Mo., was designated as the successor trustee for trusts numbers 1 through 6, inclusive. Trusts numbers 7 and 8 designated petitioner's eldest living child

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Since Mildred J. Ketter is a party to this action by reason of filing a joint return with her husband, Melvin P. Ketter will be referred to as petitioner and Mildred J. Ketter as Mildred.

who has attained the age of 21 as successor trustee with the First National Bank as alternative successor trustee.

The six trusts created for the benefit of petitioner's children are identical in form, varying only in the designation of the beneficiary. Each of these trusts is irrevocable and cannot be altered, amended, or terminated by the settlor. The trust indentures specifically preclude the settlor from borrowing money therefrom directly or indirectly, without adequate interest or security, and by their terms give sole control over trust assets to the trustee.

The trustee was given the power to invest and sell trust assets, including the power to borrow or lend money. Additionally, the trustee was authorized to form a partnership to provide to certified public accountants "general accounting, auditing, tax reporting and other services," and to incorporate such partnership or to terminate the same and wind up its business. The trust income is payable for life to the designated beneficiary after attaining age 21, unless the beneficiary requests in writing that such income be accumulated. The indenture provides that prior to the time each child attains age 21—

the net income of the Trust Estate shall be paid over to or for the benefit of [such beneficiary], * * * but in no event shall any of the net income be used or applied during the lifetime of the Settlor for the support, education or maintenance of said beneficiary, or otherwise to meet Settlor's legal obligation to support such beneficiary.

The trustee is further granted the sole discretionary right to invade trust corpus to provide for such beneficiary's education, support, and medical maintenance. If the beneficiary of a trust dies, the trust terminates and its assets are payable to the descendants and spouse of the beneficiary pursuant to a limited power of appointment granted to each beneficiary. At the time the trusts were created the six beneficiaries thereof ranged in age from 3 to 14 years.

The terms of the charitable trusts, trusts numbers 7 and 8, provide that the net income shall be accumulated until October 31 of 1978 and 1983, respectively, and thereafter paid at least annually to St. Benedict's College to be used for the general purpose of establishing a professorship in its accounting department. Mildred and a majority of petitioner's children who have attained the age of 21 are empowered to change the beneficiary of these trusts to a nonprofit organization suited to

the accomplishment of the trust purpose which is either described under section 170(c)(2) or exempt from taxation under section 501(c)(3).

Pursuant to the indentures, each trust was assigned an undivided one-eighth interest in a portion of the "work in progress" of petitioner's existing accounting firm and the employment contracts held by him with employees of his firm. The "work in progress" was transferred in two separate assignments. The first assignment, concurrent with the creation of the trusts, was reported on petitioner's 1968 gift tax return in the total value of $21,067.74. The gift tax return did not report a separate value for the gift of employment contracts.

The second assignment of "work in progress," dated December 31, 1969, was reported on petitioner's 1969 gift tax return in the total value of $35,903.54. The assignment document stated that such "work in progress" had a "standard rate value" of $55,139.34, and an "actual market value" of $43,560.08.

By these two transfers, which respondent acknowledges as valid under State law, petitioner transferred to the eight trusts, in equal shares, all of the work in progress of his accounting proprietorship along with the employment contracts containing covenants not to compete of all employees under contract to him.

The employment contracts assigned contained a covenant not to compete under which the employees agreed not to perform services for clients of the employer for a period of 5 years after termination of employment. They were standard form employment contracts petitioner used with his employees and included a penalty for violation of the provision not to compete. Either party could terminate employment at will upon 15 days written notice. After these employment contracts were transferred, petitioner was the only person active in his accounting firm.[3]

On December 21, 1968, the day the trusts were created, the trustee executed a document forming a partnership among the eight trusts (hereafter the partnership). The partnership was designated as "Melvin P. Ketter, C.P.A.," although neither petitioner nor his wife were members of the partnership. The "work in progress" and employment contracts transferred on December 21, 1968, to the trusts, were immediately reassigned to

---

[3]Since 1968, two individuals have entered into an ownership position in the accounting firm with petitioner. This accounting firm has since been incorporated.

the partnership by the trusts when the partnership was formed; there was no formal document to effect the legal assignment to the partnership of the assets transferred to the trusts in 1969.

Neither petitioner, nor the partnership, nor the trusts have recognized, for Federal income tax purposes, the income transferred as a part of the "work in progress." Originally this income was reported by the partnership for 1968, but the partnership filed an amended return for that year after respondent took the position, during an audit, that this income was taxable to petitioner rather than the partners.

The partnership agreement, which was valid under State law, provided inter alia, that the partners were to have equal management rights, that each partner could withdraw his share of the partnership net profits at the end of the year, and that each partner could withdraw upon giving 90 days' notice. Upon withdrawal, a partner was entitled to the value of his capital account without allowance for intangibles, except such costs incurred in obtaining intangibles as were reflected in the partnership books.

On December 21, 1968, petitioner entered into an agreement with the partnership as an independent contractor, employing the partnership to supply petitioner's accounting proprietorship with accounting services, including personnel, general accounting services, auditing and tax reporting services, and other clerical and administrative services. For these services, petitioner agreed to pay to the partnership an amount equal to 73 percent of the standard billing rate for such services. These payments were due the partnership when petitioner billed the client for services performed, regardless of when or whether he collected the account to which the services pertained. Since its inception, petitioner has adhered to the terms of this agreement and made all payments to the partnership for services performed.

This agreement also contemplated that petitioner would provide services to the partnership which would compensate him on a reasonable time and expense basis. Petitioner has consistently provided extensive management and administrative services to the partnership.

In the years prior to 1968, petitioner realized income from his accounting proprietorship in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1963 | $18,324 | 1966 | $34,609 |
| 1964 | 23,143 | 1967 | 30,064 |
| 1965 | 17,737 | | |

The partnership subsequently paid him the following amounts for his services:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1969 | $22,319 | 1972 | $26,960 |
| 1970 | 23,961 | 1973 | 34,041 |
| 1971 | 25,286 | 1974 | 36,264 |

He also received additional income from his separate accounting business subsequent to the creation of the trusts, the formation of the partnership, and the development of the ancillary relationships.

Petitioner expected that the partnership might make business arrangements to provide accounting services to accountants in outlying areas, but not in St. Joseph, Mo. Most clients are not aware that they are dealing with personnel in the employ of the partnership rather than the employ of petitioner. Neither petitioner, nor the partnership, nor the trusts complied with the registration provisions of Missouri Annotated Statutes sections 417.200–417.230 (Vernon 1952), requiring that a partnership conducting business in a name other than that of a partner must file its "fictitious name" with the State.

The partnership began operations with 16 employees and has expanded to 30 employees currently. The work performed by the partnership is not paid for until each job reaches a completed billable status. These jobs usually have a minimum duration of 3 months and an average time, from the start to finish, of 7 to 8 months. The monthly overhead required to keep the partnership operational has ranged from $11,445.20 in 1969 to $30,063.95 in 1974 (including depreciation). In its business operations the partnership employs machinery and equipment which had a book value of $6,400 in 1969, subsequently growing through reinvestment of partnership earnings to a book value of approximately $27,500. The cash requirements of maintaining the partnership's business operations have necessitated borrowings by the partnership, from time to time, to meet its capital needs. In 1969 petitioner lent the partnership $10,284.88 to meet its payroll.

Gawatz devoted approximately 14 hours per year to the trusts'

partnership business for which he received as compensation between \$50 and \$75 annually. He used these 14 hours per year to review the accuracy and sufficiency of accounts presented to him in his fiduciary capacity, as well as to review and sign documents requiring his signature.

Partnership returns (Forms 1065) and fiduciary income tax returns (Forms 1041), were timely filed for the taxable year ending October 31, 1969, which was the first year in which the trusts and partnership were in existence. Returns for later years were filed subsequent to the normal statutory due dates pursuant to extensions obtained by petitioner.

## OPINION

The sole issue for our determination is whether a partnership, composed of eight trusts established by the petitioner for the benefit of his six minor children and his alma mater, should be recognized for Federal income tax purposes under section 704(e).

Section 704(e)(1) provides that:

A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

This section imposes two requirements for recognition as a partner: (1) The partnership must be one in which capital is a "material income-producing factor," and (2) the person must "own" the partnership interest. We must evaluate all the facts and circumstances of the individual case to determine whether these requirements have been met. Sec. 1.704–1(e)(1) and (2), Income Tax Regs.; *Ballou v. United States*, 370 F.2d 659 (6th Cir. 1966), cert. denied 388 U.S. 911 (1967); *Pflugradt v. United States*, 310 F.2d 412, (7th Cir. 1962); *Acuff v. Commissioner*, 35 T.C. 162 (1960), affd. per curiam 296 F.2d 725 (6th Cir. 1961).

### A. Capital as a Material Income-Producing Factor

The first requirement, that capital be a material income-producing factor, reflects congressional intent that partnership income be treated in accordance with two fundamental principles of Federal income taxation: (1) Income from property is attributable to the persons who own the property, and (2) income from personal services is attributable to the persons rendering

the services. H. Rept. 586, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 357, 380; S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 485. See *United States v. Ramos*, 393 F.2d 618, 624 (9th Cir. 1968), cert. denied 393 U.S. 983 (1968); *Kuney v. Frank*, 308 F.2d 719 (9th Cir. 1962). Where capital is not a material income-producing factor, the income is generated from personal service income rather than from property, and the attempt to assign it by the creation of a partnership with one who does not contribute substantial services is not effective to shift the recognition of income from those who in fact earn it. See *Poggetto v. United States*, 306 F.2d 76, 79 (9th Cir. 1962). But where capital is a material income-producing factor, then each partner, as an owner of an interest in the capital, has a right to part of the income which that capital produces.

Section 1.704–1(e)(1)(iv), Income Tax Regs., establishes the test for determining when capital is a "material income-producing factor":

> the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business conducted by the partnership. In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership. On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment.

This test is similar to the interpretation given to the phrase "capital" as "a material income-producing factor" under other sections of the Internal Revenue Code.[4]

The partnership created by the eight trusts in the case at bar received virtually all its income as compensation for services performed by its employees. The partnership carried no invento-

---

[4]The phrase "capital" as "a material income-producing factor" occurs in sec. 911(b). It also appeared in sec. 401(c)(2)(B) before its amendment by the Act of Nov. 13, 1966, Pub. L. 89–809, sec. 204(c), 80 Stat. 1539, 1577–1578, and in sec. 1361(b)(4) (repealed effective Jan. 1, 1969 by the Act of Apr. 14, 1966, Pub. L. 89–389, sec. 4(b)(1), 80 Stat. 111, 116). Sec. 1.1361–2(e)(2), Income Tax Regs., established a test for materiality similar to that found in sec. 1.704–1(e)(1)(iv), Income Tax Regs. For earlier provisions using this phrase see secs. 25(a)(4), 116(a)(3), 449(a), and 725(a), I.R.C. 1939; sec. 209(a)(1), Revenue Act of 1924, 43 Stat. 263 (1925); secs. 200(5) and 218(d), Revenue Act of 1921, 42 Stat. 228, 245 (1923); sec. 200, Revenue Act of 1918, 40 Stat. 1058–1059 (1919). See generally, A. Aronsohn, *Partnerships and Income Taxes*, 173 n. 45 (1966 ed.); R. Lifton, "The Family Partnership: Here We Go again," 7 Tax L. Rev. 461, 468–471 (1952).

ry for sale to customers, and the value of its equipment, by comparison with its gross income and employee salary expenses, was minimal.[5] It was petitioner's reputation, and the personal services of petitioner and the employees under his supervision, which produced the partnership's income.

Petitioner acknowledges that capital is not usually a material income-producing factor where income is generated mainly through the personal services of employees. He nevertheless argues for an exception, reasoning that capital was necessary: (1) To carry employee costs and overhead between the time work for a client was commenced, and the time the client paid for such services (usually 7 to 8 months), and (2) to absorb the cost of training personnel during the period before they became economically productive. He points especially to the monthly overhead ($11,445.20 in 1969 and $15,998.61 in 1970 on the average) and the need of the partnership to borrow funds to meet current expenses. Based on this need for current operating funds, he reasons that the "work in progress" was the partnership's capital asset which enabled the partnership to produce income.[6]

The need for liquid assets to defray current operating expenses may be a factor in determining the materiality of capital as an income-producing factor.[7] But standing alone on the facts before us, it is insufficient to establish that capital was a *material* factor in the production of income. Petitioner's interpretation would virtually eliminate the capital requirement from the statute, since even the smallest law firm or doctor's

---

[5]

| Year | Gross income | Salaries paid | Basis of fixed depreciable assets |
|---|---|---|---|
| 1968 | $141,235.07 | $87,068.29 | $8,990.52 |
| 1969 | 203,421.44 | 125,741.37 | 17,719.08 |
| 1970 | 208,012.86 | 142,715.65 | 20,033.14 |
| 1971 | 275,335.17 | 164,835.36 | 28,358.09 |
| 1972 | 325,364.95 | 211,288.78 | 37,704.14 |

[6]We do not understand petitioner to contend that the "work in progress" assigned included a right to complete the jobs and thereby produce income from the services rendered. Petitioner testified that his clients remained his own and that the partnership did work for his clients as an independent contractor under contract with him separate from the assignment. Rather we understand the assignments to convey only the right to income for services previously performed by petitioner's accounting proprietorship. As such, it was clearly an assignment of income properly taxable to him. *Lucas v. Earl*, 281 U.S. 111 (1930).

[7]*Hartman v. Commissioner*, 43 T.C. 105 (1964). Cf. *O'Donnell v. Commissioner*, T.C. Memo. 1964–38; *Bennett v. Commissioner*, T.C. Memo. 1962–163.

office requires considerable amounts of cash on hand to pay staff salaries and current expenses. On the facts before us, we find that petitioner has not proven that capital is a material factor in the production of the partnership's income.

*Hartman v. Commissioner*, 43 T.C. 105 (1964), cited by petitioner is distinguishable on its facts. In *Hartman* the partnership engaged in the distribution, sale, and merchandising of ceramic ware throughout the United States. It conducted an advertising campaign, had a showroom in New York, and for 3 of the 4 years in issue, the partnership had inventories averaging over $100,000 in value. Unlike *Hartman*, the partnership before us had no inventory for sale to customers and has salary expenses comprising a higher proportion of total operating expenses. Also, the nature of the work done in the accounting profession is distinctly different from the merchandising, selling, and distribution of ceramic ware. Finally, in *Hartman* we carefully distinguished between the types of partnerships involved therein, and "those *personal service businesses* in which capital is *not* a material income-producing factor." *Hartman v. Commissioner, supra* at 119.[8] (Emphasis added.)

Nor can we say that the employees' contracts which were assigned to the trusts constituted a capital asset satisfying the materiality requirement. These contracts permitted either party to terminate the contract at will upon giving 15 days notice, and contained a limited, 5-year covenant not to compete. While petitioner estimated the value of these 16 contracts at $16,000, he admitted that this was "an arbitrary decision" on his part, and gave a vague explanation as to the basis for his estimate. This estimate appears inconsistent with his previous testimony that it takes an average of 7 years before an accounting firm's employee produces more income to his employer than he is paid

[8]Petitioner also cites *Bennett v. Commissioner*, T.C. Memo. 1962–163. However, in *Bennett* the petitioner did not personally supervise any of the engineering work done for customers by his employees. Rather than directly providing services, the firm in *Bennett* merely provided employees who the customers employed and supervised. The need for liquid assets to carry current operating expenses thereby assumed a much greater role in the production of income for a business providing specialized employees on a temporary basis.

Similarly distinguishable is *O'Donnell v. Commissioner*, T.C. Memo. 1964–38. The need for liquid capital to enable the partnership to pay advance commissions and to secure guarantees of customers' accounts was noted, but we also emphasized the large amount of valuable securities which the partnership owned and which produced a considerable portion of its income. In addition, the Court noted that in its textile selling operation, the partnership required from $15,000 to $35,000 worth of styling aids.

in salary. Further, while he now places a high value on these contracts, he failed to report a separate value for them on his 1968 gift tax return. In fact, petitioner did not even list the gift of these contracts on his return. Viewing the record as a whole, we conclude that petitioner has failed to prove these contracts were of more than nominal value. See Rule 142, Tax Court Rules of Practice and Procedure.

In the final analysis, it was neither the employment contracts, nor the work in progress, nor the small amount of equipment which enabled the partnership to produce income. Both before and after the creation of the partnership, the income depended principally on Mr. Ketter. His judgment, his experience, his integrity, his standards, his professional acumen, his reputation, and his management know-how brought in the money, whether the services were performed directly by Mr. Ketter or by others under his supervision and control. Capital was not a material income-producing factor. Sec. 1.704–1(e)(1)(iv), Income Tax Regs. See *Payton v. United States*, 425 F.2d 1324 (5th Cir. 1970), cert. denied 400 U.S. 957 (1970); *United States v. Ramos*, 393 F.2d 618 (9th Cir. 1968), cert. denied 393 U.S. 983 (1968); *Poggetto v. United States*, 306 F.2d 76 (9th Cir. 1962). Cf. *Bateman v. United States*, 490 F.2d 549, 554 (9th Cir. 1973) (Judge Wright dissenting).[9]

## B. Partners Must Own a Partnership Interest

Section 704(e)(1) also requires that petitioner prove the partnership interests were truly owned by the trust partners. This he has failed to do. It is not enough that the trusts hold nominal title where the totality of the circumstances place real dominion and control elsewhere. Sec. 1.704–1(e)(2)(i), Income Tax Regs. See, e.g., *Krause v. Commissioner*, 497 F.2d 1109 (6th Cir. 1974), affg. 57 T.C. 890 (1972); *Payton v. United States, supra; United States v. Ramos, supra; Acuff v. Commissioner*, 35 T.C. 162 (1960), affd. per curiam 296 F.2d 725 (6th Cir. 1961).

---

[9]The majority in *Bateman v. United States*, 490 F.2d 549 (9th Cir. 1973), found that capital was material in that petitioners' goodwill was transferred to the partnership. In our case, petitioner has not transferred his personal goodwill despite the partnership's use of his name since it could not use that name to attract clients, but rather functioned to provide accounting services to firms. Also petitioner retained his clients and personal goodwill in a separate accounting practice. That goodwill was never transferred is further evidenced by the fact that upon withdrawal, the value of intangibles in a partner's capital account was limited to costs incurred in their acquisition.

Courts have often noted that family partnerships, such as that formed by petitioner's trusts, must be subject to "close scrutiny" of the controls retained by the grantors since the family relationship "so readily lends itself to paper arrangements having little or no relationship to reality." *Kuney v. Frank*, 308 F.2d 719, 720 (9th Cir. 1962). Accord, *Ginsberg v. Commissioner*, 502 F.2d 965 (6th Cir. 1974), affg. a Memorandum Opinion of this Court; *Krause v. Commissioner, supra; Ballou v. United States*, 370 F.2d 659 (6th Cir. 1966), cert. denied 388 U.S. 911 (1967); H. Rept. 586, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 357, 381; S. Rept. 781, 82d Cong., 1st Sess., (1951), 1951–2 C.B. 458, 486; 6 J. Mertens, Law of Federal Income Taxation, sec. 35.08 (1975 rev.).

Section 1.704–1(e)(2), Income Tax Regs., lists a series of factors to be considered in determining whether a partner, who has been given a capital interest in a partnership, possesses the real incidents of ownership, or whether another has retained actual dominion and control. It is clear from both the regulations and the cases applying them that these factors are illustrative, not exhaustive, and that the issue of control is ultimately a factual question turning on all of the circumstances.

We recognize, as petitioner points out, that he retained no reversionary interest in the trusts; that the income from the trusts is payable annually to the beneficiaries and has not been invested or spent so as to give him direct benefit; that the partnership agreement gave each trust a right to liquidate its interest; and that the partnership kept separate books and records, maintained two bank accounts over which the trusts had sole control, and filed its own tax returns. Nevertheless, the controls retained by petitioner, and the manner in which the partnership conducted its business, clearly demonstrate that petitioner retained actual dominion and control.

Petitioner's functions as manager of the partnership's business appear to be, with minor exceptions, essentially the same as those functions he performed as sole owner of the accounting business before the partnership was formed. He is clearly the chief administrator of the partnership's daily affairs and is subject to only the most general control by the trustee, whose oversight is limited to 12 to 14 hours per year.

Petitioner's independent accounting practice was also a major vehicle of control over the partnership. Since the partnership

could not contract directly with clients it depended upon referrals from certified public accountants. Petitioner supplied the partnership with work by contracting with it to service his clients. There was no evidence that any other firms utilized the partnership's services. Nor was there any evidence that either petitioner or the trustee actively sought business from anyone other than petitioner.

Thus, through petitioner's control of the source of work which entered the partnership, he effectively retained "control of assets essential to the business." Sec. 1.704–1(e)(2)(ii)(c), Income Tax Regs. The use of such a separate grantor-controlled entity to regulate the flow of income to a partnership has frequently been found a significant factor leading to the nonrecognition of the partnership for Federal income tax purposes. *Krause v. Commissioner*, 497 F.2d 1109 (6th Cir. 1974), affg. 57 T.C. 890 (1972); *United States v. Ramos*, 393 F.2d 618 (9th Cir. 1968), cert. denied 393 U.S. 983 (1968); *Kuney v. Frank*, 308 F.2d 719 (9th Cir. 1962).[10]

Petitioner's control is also evidenced by the manner in which the partnership conducted "its" business. The general public was unaware of its existence. The clients whose books they audited normally believed they were dealing directly with petitioner's employees and not with an independent contractor. This confusion was aided by the close connection between the partnership and petitioner, its manager. It was furthered by the name, "Melvin P. Ketter, C.P.A.," adopted by the partnership, and by its failure to register the name in accordance with the State's fictitious name statute. Mo. Ann. Stat. secs. 417.200–417.230 (Vernon 1952).

"Whether or not the donee has been held out publicly as a partner in the conduct of the business, [or] in relations with customers * * * is of primary significance." Sec. 1.704–1(e)(2)(vi), Income Tax Regs. Where, in the eyes of the public, an entity neither looks, nor acts, nor ostensibly purports to be separate from another, it is persuasive evidence that it is but an alter ego of another created to gain the potential tax savings

---

[10]That the control was exercised indirectly, through another entity, is irrelevant:

Controls inconsistent with ownership by the donee may be exercised indirectly as well as directly, for example, through a separate business organization, estate, trust, individual, or other partnership. Where such indirect controls exist, the reality of the donee's interest will be determined as if such controls were exercisable directly. [Sec. 1.704–1(e)(2)(iii), Income Tax Regs.]

available through the use of multiple entities. See *Ginsberg v. Commissioner*, 502 F.2d 965 (6th Cir. 1974), affg. a Memorandum Opinion of this Court; *Payton v. United States*, 425 F.2d 1324 (5th Cir. 1970), cert. denied 400 U.S. 957 (1970).[11]

In response, petitioner states that he was ignorant of the fictitious name statute, and that the failure to hold out the partnership as an independent entity is irrelevant since it could not deal directly with the general public. But this avoids the basic question as to whether petitioner and the public recognized and treated the partnership as an independent entity for business purposes. Normal business practice is to recognize different entities as distinct, and the failure of the partnership to hold itself out or be recognized as a distinct entity supports respondent's position that "in operation there was no independently owned partnership meriting recognition for Federal tax purposes."

Furthermore, we find it significant to note that the partnership was named after petitioner, "Melvin P. Ketter, C.P.A.," despite the fact that he was not a partner. It seems strange indeed that petitioner, a professional accountant, would lend his name to an organization over which he claims to have no control. The lending of his name could do little more than create in the public mind the image of one organization. Such mingling of its identity with the personality of petitioner, illustrates his dominance over the partnership and is strong evidence of its lack of truly independent substance. Finally, we are not convinced that this failure to hold itself out as an independent entity was as harmless from a business standpoint as petitioner contends. Certainly it prevented it from developing a separate goodwill of its own which could attract other accounting firms to use its services. Further, the dominance so displayed by petitioner may have deterred his competitors from utilizing its services.[12]

---

[11]The following cases in which partnerships have been recognized under sec. 704(e) are distinguishable, among other reasons, on the ground that the courts there made specific mention—often with considerable emphasis—of the fact that the partnerships had been held out as separate entities and the trusts or minors purporting to be owners of interests were recognized as such by the public: *Woodbury v. Commissioner*, 49 T.C. 180 (1967); *Hartman v. Commissioner*, 43 T.C. 105 (1964); *Smith v. Commissioner*, 32 T.C. 1261 (1959); *Peterson v. Gray*, an unreported case (W.D. Ky. 1959, 4 AFTR 2d 5559, 59-2 USTC par. 9692); *O'Donnell v. Commissioner*, T.C. Memo. 1964-38; *Bennett v. Commissioner*, T.C. Memo. 1962-163.

[12]And it is perfectly clear that petitioner, not the trustee, was calling the shots for the partnership, no matter how impeccably the paper was arranged. We base this conclusion on a number of factors: the relationship of petitioner and Gawatz; their relative accounting experience; the very brief time

In summary, we conclude that petitioner has not proven that capital is a material income-producing factor to the partnership composed of the eight trusts he established and therefore, the partnership interests do not qualify for recognition under section 704(e)(1). We further hold that petitioner retained such incidents of dominion and control over the partnership that the trusts cannot be recognized as owners of the partnership interests under section 704(e)(1).

*Decision will be entered for respondent.*

Gawatz devoted to partnership affairs (12–14 hours annually), and the perfunctory manner in which he performed these duties; the absence of any evidence that any genuine negotiation with petitioner over any matters affecting the business of the partnership ever took place; and our observations of the parties during the trial. The trustee was clearly amenable to petitioner's will, and there is no evidence he ever actively represented the beneficiary's interests. Sec. 1.704–1(e)(2), Income Tax Regs.