*Decision will be entered under Rule 50.*

EMIL MORTON AND LOTTIE MORTON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2444–64, 6063–65.   Filed September 21, 1966.

*H. P. Forrest* and *Michael D. Bodne*, for the petitioners.
*Glen W. Gilson II*, for the respondent.

The Commissioner determined deficiencies against Emil and Lottie Morton for the calendar years 1960, 1961, and 1962 in the amounts of $5,500.67, $621.33, and $24,559.76 respectively, and an addition to tax under section 6651(a) of $155.33 for the year 1961.   The question for decision is whether the incomes and losses ascribed to three trusts established by Emil Morton should be attributed to him.

#### FINDINGS OF FACT

Certain facts and exhibits have been stipulated by the parties and as stipulated are incorporated herein.

Emil and Lottie Morton, husband and wife, residing at 5646 North Bay Road, Miami Beach, Fla., filed their joint Federal income tax

returns for the calendar years 1960, 1961, and 1962 with the district director of internal revenue, Jacksonville, Fla. They are the parents of three sons, David, Peter, and Robert, who were born on June 22, 1950, September 27, 1951, and August 28, 1955, respectively.

Emil Morton (hereinafter referred to as petitioner) moved to Florida on November 11, 1957. Prior to that time he had been involved for more than 15 years in practically every phase of the real estate business on Long Island, N.Y., including the building of one-family homes, apartment houses, shopping centers, and gas stations. As of January 23, 1961, petitioner's net worth was in excess of $5 million, and on December 31, 1961 and 1962, respectively, his net worth was in excess of $6 million.

In June 1959, petitioner was approached by a real estate broker with respect to the purchase of a parcel of real estate in Miami Beach, Fla., on which was situated the Flamingo Hotel. The property consists of approximately 13 acres and is located on 15th Street and Bay Road, Miami Beach, on Biscayne Bay. The hotel was about 35 years old and contained approximately 280 hotel rooms; there were also some cottages on the premises. The property was owned at that time by the Flamingo Hotel Co., an Ohio corporation.

Petitioner along with his brother, Lawrence Morton, and Sydney Newman agreed to purchase the property as equal partners and possibly lease it out as a hotel, spa, nursing home, or old-age home, but primarily to construct apartment buildings thereon. Lawrence Morton had been in the real estate business for approximately 35 years and engaged in extensive building construction on Long Island, N.Y.; for several years prior to 1957, when petitioner moved to Florida, petitioner and Lawrence were associated together in business. Sydney Newman is a New York attorney and a "man of substantial means and financial ability."

On July 15, 1959, a contract for the purchase of the Flamingo Hotel property was entered into between the Flamingo Hotel Co. and Omaran Corp., a Florida corporation whose sole purpose was to serve as a conduit taking title to the property and then transferring it. It had no stockholders or directors. The contract provided for a purchase price of $1,365,000, and a $100,000 deposit was paid by check of petitioner to an escrow agent. Subsequently, on September 23, 1959, an agreement modifying the original contract was signed providing that the purchase price would be reduced to $1,262,625; such reduction was based on the purchaser's undertaking to pay all brokerage costs. The brokerage costs amounted to $88,255 so that the total price paid for the property was $1,350,880.

On September 23, 1959, a warranty deed, which was thereafter duly recorded, was signed transferring the property from Flamingo Hotel

Co. to Omaran Corp., and on September 25, 1959, the deal was closed with the purchase price to be paid as follows:

| | |
|---|---:|
| Deposit paid on signing of contract held in escrow | $100,000.00 |
| Unpaid balance of first mortgage | 350,877.80 |
| Interest on first mortgage from September 27, 1959, through September 30, 1959 | 116.97 |
| Purchase money second mortgage | 514,000.00 |
| Adjustments for real estate and personal property taxes | 29,379.60 |
| Payment due at closing | 268,250.63 |
| Total purchase price (exclusive of brokerage costs) | 1,262,625.00 |

The purchasers at that time were required to put up cash in excess of $450,000, including the $100,000 deposit, and the brokerage fees.

On September 28, 1959, the Flamingo Hotel property was transferred by a duly recorded warranty deed from Omaran Corp. to Samoran Corp., a Florida corporation. The stock of Samoran Corp., which is "strictly a nominee corporation," is owned by the following persons and in the following percentages:

| | Percent |
|---|---:|
| Emil Morton, "as Trustee" | 33⅓ |
| Lawrence Morton | 9⅓ |
| James Morton | 8 |
| Alan Morton | 8 |
| Richard Morton | 8 |
| Robert W. Newman | 16⅔ |
| Janice Newman | 16⅔ |

James Morton, Alan Morton, and Richard Morton are sons of Lawrence Morton all of whom had reached majority by September 1959. Robert W. Newman and Janice Newman are the children of Sydney Newman and were also adults at that time.

On September 30, 1959, Samoran Corp. transferred by a duly recorded warranty deed undivided interests in the Flamingo Hotel property to its stockholders in proportion to their shareholdings. No portion of the property was placed in the name of Sydney Newman.

On December 22, 1959, the seven record owners of the Flamingo Hotel property signed a partnership agreement with respect to that property in contemplation of the erection of two 14-story apartment buildings thereon. The partnership is sometimes referred to herein as Morton Towers Co. All moneys for "the acquisition, maintenance and improvement" of the property were to be advanced by the parties in accordance with the proportionate ownership interest held by each. Petitioner was "to supervise the operation of the Property prior to the commencement of the demolition of the existing buildings, the demolition of the said buildings, the construction of the contemplated new structures, and the operation of such structures, without compensation." In consideration of the services to be performed by

726

petitioner it was agreed that the profits from the operation and sale of the property would be allocated as follows:

|  | Percent |
|---|---|
| Emil Morton, as trustee | 46 |
| Lawrence Morton | 7½ |
| James Morton | 6½ |
| Richard Morton | 6½ |
| Alan Morton | 6½ |
| Janice Newman | 13½ |
| Robert W. Newman | 13½ |

The agreement provided that "amortization" and depreciation were to be allocated as follows:

|  | Percent |
|---|---|
| Emil Morton, as trustee | 40 |
| Lawrence Morton | 8 |
| James Morton | 7⅓ |
| Richard Morton | 7⅓ |
| Alan Morton | 7⅓ |
| Janice Newman | 15 |
| Robert W. Newman | 15 |

The agreement further provided as follows:

5. The parties agree that they will not sell or assign their ownership interests, except with the consent of all the owners, except that any party may transfer same to his respective spouse, parent, brother, sister or lineal descendant. EMIL MORTON shall have the right to assign all or any part of his interest in the profits (that is, the difference between his ownership interest of 33⅓% and his interest in the profits) but the parties hereto shall be required to deal only with EMIL MORTON and not with any Assignee or Assignees.

Pursuant to this agreement, Morton Towers Co. razed the Flamingo Hotel and constructed two modern apartment buildings containing a total of 1,273 apartments together with additional improvements and an adjoining commercial building. The costs of the improvements were as follows:

| Date | Improvement | Amount |
|---|---|---|
| 1960 | South Building | $6,775,242.04 |
| 1961 | Addition | 79,423.33 |
| 1962 | Addition | 103,185.12 |
|  | Total | 6,957,850.49 |
| 1961 | North Building | 6,087,802.63 |
| 1962 | Additions | 143,506.63 |
|  | Total | 6,231,309.26 |
| 1962 | Commercial Building | 331,514.64 |

In addition to cost of the improvements, about $115,000 was spent for razing the old Flamingo Hotel and approximately $1,500,000 was

expended for personal property such as furniture, furnishings, and appliances.

The construction of the South Building in 1960 was financed through a 2-year $4 million loan from the Chase Manhattan Bank and a $200,000 loan from New England Holding Corp. The loans were made to Samoran Corp., and the loan from the Chase Manhattan Bank was guaranteed by Emil Morton (in an individual capacity), Lawrence Morton, Robert W. Newman, and their wives. Both of these loans were taken over by Connecticut General Life Insurance Co. which lent an additional $1,800,000 to the venture through Samoran Corp. The total amount of $6 million was secured by about 6.513 acres of the property and was guaranteed by Emil Morton (in an individual capacity), Lawrence Morton, Robert Newman, and Janice Newman to the extent of the first $1 million.

For the construction of the North Building in 1961 a loan of $4,500,000 was obtained from the Chase Manhattan Bank to Samoran Corp. This loan was also taken over by Connecticut General Life Insurance Co. which lent an additional $2 million to Samoran Corp. The $6,500,000 was guaranteed by the same persons to the extent of the first $1 million.

On June 15, 1962, the loans were consolidated so that Samoran Corp. owed Connecticut General Life Insurance Co. $12,250,000 [1] on 20-year notes secured by a mortgage on the entire property. The loan was guaranteed, again by the same persons, to the extent of the first $1,750,000.

Additional funds needed for the construction of the buildings were supplied by the several owners of the property, and were in excess of $1,200,000. Petitioner personally borrowed $400,000 or $500,000 to help finance the share required of his one-third interest.

On April 5, 1966, the value of the land and buildings of Morton Towers Co. was approximately $20 million.

In 1959, at the outset of the venture it was understood that each of the three principals involved (petitioner, Lawrence Morton, and Sydney Newman) might "give" or otherwise allocate a portion of his interest to members of his family, but it was agreed that the three principals alone would have complete control of the venture and make all decisions pertaining thereto. Thus Lawrence Morton arranged to have an 8-percent interest in the property transferred directly to each of his three sons at the outset, and subsequently obtained an irrevocable power of attorney from them dated December 28, 1959, with respect to their interests. Similarly, Sydney Newman arranged to have a 16⅔-percent interest in the property transferred to each of his two children at the outset, and subsequently obtained an irrevocable power of

---

[1] The original $6 million loan had been repaid to the extent of $250,000.

attorney from them dated December 29, 1959, with respect to their interests.

Petitioner took title to his 33⅓-percent interest "as Trustee." However, no trust or trusts had then been established at the time title was thus received in late September 1959.

On October 30, 1959, petitioner executed three substantially identical declarations of trust, stated to be irrevocable, each for the benefit of one of his three minor children. Each instrument provided in part as follows:

1. TRUST PROPERTY: The Settlor hereby declares that he has received in trust, by transfer from himself, as an individual, the sum of Four Thousand ($4,000.00) Dollars, as Trustee, and that he has purchased, as Trustee, for said sum a four (4%) percent interest in and to that certain property conveyed by FLAMINGO HOTEL COMPANY to OMARAN, CORP., by deed dated September 23, 1959, recorded in Official Record Book 1657 at page 698 of the Public Records of Dade County, Florida, together with the personal property included in the transaction; that the trust acquired thereby a four (4%) percent interest in the profits and losses of said venture but that in the determination of profits and losses, the trust shall be charged with three (3%) percent depreciation and three (3%) percent amortization.

Each trust provided that the trustee was to accumulate the income of each trust for the benefit of the beneficiary of that trust. When the beneficiary reached 25 years of age the trustee was to pay over one-half of the accumulated income and one-half of principal to him. The balance of the principal and any remaining income was to be distributed to the beneficiary when he reached 30 years of age. The trustee had discretion to keep the trusts in one or more consolidated funds and make necessary allocations only on the trustee's books of account.

Under the terms of each trust, the trustee had the following powers:

5. TRUSTEE'S POWERS: So long as EMIL MORTON shall be Trustee hereunder, he shall have full power and authority to retain all the investments of the Trust Estate and to manage and control the Trust Estate and to sell, exchange, lease, rent, assign, transfer or otherwise dispose of all or any part thereof upon such terms and conditions as he may in his discretion deem proper. He may invest and reinvest all or any part of the trust estate in such common or preferred stocks, bonds, debentures, mortgages, deeds of trust, notes or other securities, investments or property which he in his absolute discretion may select or determine, it being the express desire and intention that the said Trustee shall have full power to invest and reinvest the trust funds as if it were his own property, without being restricted to forms of investments which the Trustee may otherwise be permitted by law to make. Without limitation of the powers heretofore conferred upon EMIL MORTON as Trustee, or by statute or by general rules of law he is hereby expressly authorized and empowered in his sole and absolute discretion:

a) To sell, pledge, mortgage, transfer, exchange, convert or otherwise dispose of, or grant options with respect to, any and all property at any time forming a part of the trust estate, in such manner, at such time or times, for such purposes, for such prices and upon such terms, credits and conditions as he may deem advisable.

b) To borrow money for any purpose connected with the protection, preservation or improvement of the trust estate whenever in his judgment advisable, and as security to mortgage or pledge any real or personal property forming a part of the trust estate upon such terms and conditions as he may deem advisable and to guarantee repayment of any loan in which the Trustee shall participate.

c) To vote in person or by general or limited proxy with respect to any shares of stock or other securities held by them; to consent, directly or through a committee or other agent, to the reorganization, consolidation, merger, dissolution or liquidation of any corporation in which the trust may have any interest, or to the sale, lease, pledge or mortgage of any property by or to any such corporation; and to make any payments and to take any steps which he may deem necessary or proper to enable him to obtain the benefit of any such transaction.

d) To hold investments in the name of a nominee.

e) To pay, compromise, compound, adjust, submit to arbitration, sell or release any claims or demands of the trust against others or of others against the trust on such terms as he may deem advisable, including the acceptance of deeds of real property in satisfaction of bonds and mortgages, and to make any payments in connection therewith which he may deem advisable.

f) To make distribution of the principal of the trust estate in kind and to cause any share to be composed of cash, property or undivided fractional shares in property different in kind from any other share.

g) To execute and deliver any and all instruments in writing which he may deem advisable to carry out any of the foregoing powers. No party to any such instrument in writing signed by the Trustee shall be obliged to inquire into its validity, or be bound to see to the application by the Trustee of any money or other property paid or delivered to him by such party pursuant to the terms of any such instrument.

h) Dividends on shares of stock payable in the stock of any class of the corporation declaring or authorizing the same shall be treated as principal, except that any such dividends paid in lieu of period cash dividends or in lieu of recoupment of dividends defaulted or accumulated while the shares of stock are held in the trust shall be income.

i) Rents, royalties and cash dividends received from wasting assets (including without limitation cash dividends paid by oil, coal, lumber or mining companies), extraordinary cash dividends other than liquidating dividends, and dividends payable in the stock of a corporation other than the corporation declaring or authorizing the same shall be income.

j) The proceeds of the sale of unproductive or underproductive property, liquidating dividends and rights to subscribe to stock shall be principal.

k) No sinking fund shall be created as to any security received or purchased at a premium or at a price in excess of the call or redemption price.

Upon the death, resignation or disqualification of EMIL MORTON, as Trustee, unless he shall have by written instrument executed by him and witnessed by two witnesses designated other powers for the successor Trustee or Trustees, the said successor Trustee or Trustees shall take control and management of the estate. They may hold and retain as investments of the estate, all investments, securities and other property, real and personal, which shall at the time of his death, be included in the Trust Estate. They may sell, exchange or otherwise dispose of same but shall reinvest the proceeds thereof only in United States Government bonds, or shall deposit said proceeds only in institutions whose deposits shall be insured by an agency of the United States Government.

The value of each 4-percent interest was approximately $18,000 at the time the declarations were made. For the calendar year 1959 petitioner filed a Federal gift tax return, on which he paid a gift tax of $75.38 and reported, among others, the following items:

| Item No. | Description of gift | Date of gift | Value at date of gift |
|---|---|---|---|
| 1 | To Emil Morton trustee for son David Morton under indenture of trust dated 10/59—cash | 10/59 | $4,000 |
| 2 | To Emil Morton trustee for son Peter Morton under indenture of trust dated 10/59—cash | 10/59 | 4,000 |
| 3 | To Emil Morton trustee for son Robert Morton under indenture of trust dated 10/59—cash | 10/59 | 4,000 |

The alleged $4,000 gifts were not made in cash to the trusts but reflected merely a theoretical allocation of funds of petitioner to each trust. Since the initial cash outlay for the venture was approximately $450,000, the allocable cost of a 4-percent interest therein would be about $18,000. Petitioner testified that such interest had a value of $16,000, and that, in addition to the original $4,000 gift, he made a loan of $12,000 to each trust so that each trust would be enabled to purchase a 4-percent interest in the venture. However, he in fact made no such loans to the trusts. There was no transfer of funds to the trusts, no evidences of indebtedness in respect thereof were executed, no collateral put up, no interest charged in respect thereof, and no maturity date fixed. No conveyance of real estate or any interest therein was ever made to any of the trusts, nor were the trust instruments ever recorded.

The books and records of the trusts which were set up during April 1961 as of January 1, 1961, show a total investment of $137,160 in Morton Towers Co. for each trust. The investment by each trust was purportedly made up of the following:

| | |
|---|---|
| Gift from Emil Morton | $4,000.00 |
| Reinvested profits—Mar. 31, 1962 | 30,754.95 |
| Reinvested profits—June 30, 1962 | 10,542.74 |
| Loans from Emil Morton | 91,862.31 |
| Total invested by each trust | 137,160.00 |

The purported loans shown above did not involve any actual transfer of funds by Emil Morton to the trusts, and, like the original alleged loans of $12,000 each, were not reflected in any evidences of indebtedness, did not have any collateral or maturity dates, nor did they bear interest. Like the original alleged loans, these subsequent purported loans were not bona fide loans. They represented merely the results of an accountant's computations, and existed only as book entries in books that were set up for the first time in April 1961.

The books and records of the trusts were maintained by the same accountant who kept the books and records of Morton Towers Co. and those of petitioner. In addition, he prepared the tax returns filed by the trusts, petitioner, and Morton Towers Co.

The partnership information return for 1959 reported capital contributions from each trust of only $4,000 in that year. The return for 1960 reported a capital contribution in that year in the amount of $20,000 from each trust. The return for 1961 showed no additional contribution from the trusts in that year, and the 1962 return showed a capital contribution of $30,754.95 from each trust.

On December 18, 1962, checking accounts were opened for each trust at the Miami Beach First National Bank. During the period December 18, 1962, through January 15, 1964, deposits totaling $41,430.30 were credited to each account and checks totaling $41,356.33 were drawn on each account. Deposits totaling $38,630.30 were from distributions made by Morton Towers Co., and one deposit on October 15, 1963, in the amount of $2,800 was an advance from Emil Morton. Checks totaling $37,200 were drawn to the order of Emil Morton for repayment of the alleged loans which he had made to each trust. One check dated October 15, 1963, in the amount of $4,156.33, was drawn to the order of the Internal Revenue Service.

The records of the trusts show that between December 31, 1963, and October 13, 1964, profits attributable to each trust in the amount of $41,417.44 were distributed by Morton Towers Co. directly to Emil Morton and treated as repayments of the alleged loans made by him to each trust. On October 12 and 13, 1964, Emil Morton advanced to each trust a total of $6,520.78 in order to pay taxes totaling $6,406.47.

On January 26, 1960, petitioner entered into an agreement with Robert L. Turchin, a general contractor in Miami Beach, who assisted petitioner in the construction of the apartment buildings. The agreement provided that Turchin would provide "5% of the monies for the acquisition, maintenance and improvement of the property," and in consideration therefor petitioner agreed to pay him "8% of the entire profits from the operation and sale of the said property as and when the same are distributed." However, Turchin was to be allowed only 5 percent of the depreciation and amortization.

Between February 2, 1960, and February 12, 1962, Turchin invested cash of $249,000 in Morton Towers. Between January 24, 1961, and June 20, 1962, he received refunds of $162,610.06, so that his net cash investment in Morton Towers was $86,389.94. He also reinvested profits from the venture in the amount of $85,060.06, so that his total actual investment was $171,450. On several occasions petitioner lent funds to Turchin so that he could make the required advances, and sometimes charged interest on such loans.

In addition to the interests purportedly transferred to the trusts for his children and to Turchin, petitioner transferred a 1-percent interest in the income of Morton Towers after deductions for "operating expense, interest, amortization of mortgages and taxes," to his oldest brother, Samuel Moskowitz. In return therefor Samuel Moskowitz was to invest $15,000 plus 1½ percent of "the total monies for the improvement of the property." The advances were to be paid to petitioner. In respect of that interest a total of $40,000 was invested.

There was no conveyance of any interest in the property by deed or otherwise to any of the trusts, and the declarations of trust themselves were never recorded. The transfers of interests from petitioner to Turchin and Samuel Moskowitz were not by deed and were not recorded. It appears that all participants in the venture, the Internal Revenue Service and other persons dealing with the partnership were aware that petitioner purportedly held his interest to some extent "as trustee" and in some instances knew of the specific interests owned by Turchin and Samuel Moskowitz, and allegedly owned by the trusts.

The trusts were not liable as guarantors for any of the loans made to Samoran Corp. The same was true of Turchin, Samuel Moskowitz, and the three sons of Lawrence Morton. No services were performed in respect of the property by the beneficiaries of the trusts or by petitioner in his capacity as trustee. The same was true of Lawrence Morton and his sons, Robert W. Newman, Janice Newman, and Samuel Moskowitz.

OPINION

RAUM, *Judge:* In June 1959, petitioner and two others agreed to purchase a parcel of real estate in Miami Beach, each to have an undivided one-third interest therein. When title was taken in September 1959, each of the other two persons arranged to have his interest (in whole or in part) taken in the names of his adult children. It was agreed, however, that only the three principals were to have any voice in the management and operation of the property, and the necessary control in respect of the other two principals was thereafter insured through irrevocable powers of attorney given to them by their children. The record owners of the property subsequently entered into a partnership agreement looking towards the construction and operation of an apartment development thereon, and the question before us is whether petitioner's one-third share of the income and losses of that enterprise are to be ascribed to him or whether certain portions thereof are chargeable to three trusts executed by petitioner purportedly for the benefit of each of his three minor children. We have concluded that these trusts never acquired any interest in the property, that they were shams for tax purposes, that they were not in

fact bona fide members of the partnership, and that no part of the partnership earnings or losses may be attributed to them.

After acquisition of the property through dummy corporations, the entrepreneurs caused it to be conveyed by warranty deed on September 30, 1959, to the individual owners in stated percentages. Petitioner and his one-third interest were described in the deed as follows: "Emil Morton, as Trustee, as to an undivided 33⅓%." However, no trusts of any kind were then in existence to which the designation "as Trustee" were intended to apply; no beneficiaries were named; nor was the extent of any interest of a beneficiary set forth.

It seems clear that, under Florida law, petitioner at that time acquired an absolute fee simple title to one-third of the property, unburdened by any trust.[2] Whether he might later execute any trust or trusts, what the extent and nature thereof or the identity of the beneficiaries might be—these were completely within his absolute and uncontrolled discretion. Nor is it accurate to contend that petitioner had made some kind of gift to his children as of September 30, 1959, that served as the basis for characterizing his taking title as on their behalf. For, even the three alleged gifts of $4,000 each, upon which petitioner relies and which will be considered more fully hereinafter, were made about a month *thereafter*. Not only are the subsequently executed trust instruments dated October 30, 1959, but the gift tax return fixes the date of the alleged gifts as "10/59." When he took title on September 30, 1959, petitioner took absolute, fee simple title, completely unburdened by any trust.

Moreover, we are satisfied that the so-called declarations of trust of October 30, 1959, were shams for tax purposes. Accordingly, we

---

[2] Sec. 689.06, Fla. Stat. Ann. (1941), captioned "How trust estate conveyed" provides:

"All grants, conveyances or assignments of trust or confidence of or in any lands, tenements or hereditaments, or of any estate or interest therein, shall be by deed signed, sealed and delivered, in the presence of two subscribing witnesses, by the party granting, conveying or assigning, or by his attorney or agent thereunto lawfully authorized, or by last will and testament duly made and executed, or else the same shall be void and of none effect."

No such procedure was followed here.

Furthermore, sec. 689.07, as amended, provides as follows:

"(1) Every deed or conveyance of real estate heretofore or hereafter made or executed, in which the words "trustee" or "as trustee" are added to the name of the grantee, and in which no beneficiaries are named nor the nature and purposes of the trust, if any, are set forth, shall grant and is hereby declared to have granted a fee simple estate with full power and authority in and to the grantee in such deed to sell, convey and grant and encumber both the legal and beneficial interest in the real estate conveyed, unless a contrary intention shall appear in the deed or conveyance; provided, that there shall not appear of record among the public records of the county in which the real property is situate at the time of recording of such deed or conveyance, a declaration of trust by the grantee so described declaring the purposes of such trust, if any, declaring that the real estate is held other than for the benefit of the grantee.

\* \* \* \* \* \* \*

"(4) Nothing herein contained shall prevent any person from causing any declaration of trust to be recorded before or after the recordation of the instrument evidencing title or ownership of property in a trustee; nor shall this section be construed as preventing any beneficiary under an unrecorded declaration of trust from enforcing the terms thereof against the trustee; \* \* \*"

need not consider petitioner's position that these declarations somehow or other related back to the deed of September 30, 1959, and thus satisfied the foregoing requirements of Florida law—a position that we find doubtful at best—for, in our judgment, these were not bona fide trusts for tax purposes even if there were technical compliance with the Florida statute.

Petitioner appears as "settlor" and "trustee" in each of the three trusts, in which it is stated that the settlor "has received in trust, by transfer from himself, as an individual, the sum of Four Thousand ($4,000) Dollars, as Trustee, and that he has purchased, as Trustee, for said sum a four (4%) percent interest in" the property in question and that the trust acquired a 4-percent interest in the profits and losses of the venture. Not only was there no deed of transfer of title to any 4-percent interest in the property to each of the trusts, but the foregoing recitations are either inaccurate, misleading, or false. Petitioner did not in fact transfer any $4,000 to himself, by check, cash, or otherwise. Although he testified with apparent confidence that he did give checks in that amount, and that he indeed had the canceled checks therefor, other and more credible evidence establishes to our satisfaction that there were no such checks or transfers of funds in any manner.

Furthermore, the sham character of the transaction is emphasized by the statement that petitioner, as trustee, purchased a 4-percent interest in the property for that sum. He did no such thing. The cash required for the consummation of the purchase of the property as a whole was somewhat in excess of $450,000, and a 4-percent interest therein would come to at least $18,000. It was recognized by petitioner at the trial that $4,000 was insufficient to buy a 4-percent interest in the property, which he erroneously computed to be $16,000; and he explained the transaction by testifying that in addition to the $4,000 gift he made a $12,000 loan to each trust so as to enable it to make the purchase. We found his testimony incredible, and are satisfied that no such loans were in fact made. In an obvious effort to protect himself against the conclusion that there were no such loans, petitioner makes a last ditch contention that he gave $12,000 to each of the trusts as a gift. But this too is incredible. Not only did the gift tax return set forth gifts in the amount of only $4,000 each in this connection, but the record is utterly devoid of credible evidence that petitioner in any way ever transferred $12,000 to any of the trusts to acquire the alleged 4-percent interests. At most, this was merely arithmetic sleight of hand. When petitioner bought his one-third interest in the property in September 1959 he was using his own money to obtain that interest for himself notwithstanding the use of the words "as Trustee" after his name. There were no trusts then in existence to

which those words were intended to apply.[3]  And when instruments purporting to establish such trusts were executed about a month later no property was in fact transferred to the trusts at that time.

It was only thereafter, on December 22, 1959, that the partnership agreement was executed.  The trusts do not appear as parties to this agreement, but petitioner Emil Morton is a party, again described loosely "as Trustee," with a 33⅓-percent ownership of the property.  The matter is further confused by the partnership returns (prepared by the same accountant who acted for petitioner in these transactions) which show only a $4,000 investment in the enterprise by each trust for 1959.  It seems all too clear to us that these were but part of the clumsy and inconsistent efforts to create the illusion that independent entities (the alleged trusts) had a bona fide interest in the venture.

We need not dwell upon the exceedingly broad powers which petitioner retained in respect of these trusts, or upon the unsatisfactory character of the evidence relating to the accounting for the alleged assets of the trusts, or upon the manner in which the trusts were administered, with petitioner withdrawing the bulk of the funds paid into the trusts' belatedly opened bank accounts purportedly in repayment of loans made by him which seem to have a ghostlike quality.  Needless to say, we cannot find that the trusts were bona fide independent entities, that they each actually owned a 4-percent interest in the property, or that each of them was a bona fide partner in the venture.

The applicable principles, at least as they affect the partnership issue, are set forth in *Commissioner* v. *Tower*, 327 U.S. 280, and *Lusthaus* v. *Commissioner*, 327 U.S. 293, as explained by *Commissioner* v. *Culbertson*, 337 U.S. 733, and limited by section 704(e) of the 1954 Code.[4]

In discussing the effect of section 704(e), originally enacted in 1951 as section 191 of the 1939 Code, the House Ways and Means Commit-

---

[3] Although the record discloses that some other earlier trusts were then in existence, there is no suggestion or contention that petitioner was acting in behalf of *those* trusts.
[4] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(e) FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

(2) DISTRIBUTIVE SHARE OF DONEE INCLUDIBLE IN GROSS INCOME.—In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital.  The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service.

(3) PURCHASE OF INTEREST BY MEMBER OF FAMILY.—For purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital.  The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trusts for the primary benefit of such persons.

tee, H. Rept. No. 586, 82d Cong., 1st Sess., pp. 32, 33 (1951), 1951–2 C.B. 357, 380–381, stated as follows (see also, S. Rept. No. 737, 82d Cong., 1st Sess., pp. 38, 39–40, 1951–2 C.B. 458, 485–487) :

The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford* (309 U.S. 351). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale.

Taking these standards into account, we conclude on the record before us that petitioner is chargeable with the income and losses of the venture which he attempted to attribute to the trusts. In the circumstances, we need not consider the Government's contentions relating to section 675 of the 1954 Code. Nor is it necessary to discuss petitioner's argument based upon *Wofford* v. *Commissioner*, 207 F. 2d 749 (C.A. 5), since we found that the trusts were not bona fide owners of any interest in the property.

*Decisions will be entered for the respondent.*