ADOLPH K. KRAUSE AND JANET S. KRAUSE, PETITIONERS *v.* COMMIS-SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6125-69.    Filed March 30, 1972.

*Platt W. Dockery* and *R. Malcolm Cumming*, for the petitioners. *Gary F. Walker*, for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1964, 1965, and 1966 in the respective amounts of $24,852.27, $30,843.80, and $42,878.31.

The issues presented for determination are:

(1) Whether the six trusts created by petitioners for the benefit of their children and grandchildren are bona fide partners in A. K. Co., a limited partnership.

(2) Whether the trusts are controlled by the grantor trust provisions, thereby causing the trusts income to be taxable to petitioners.

---

## FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Adolph K. Krause and Janet S. Krause (sometimes hereinafter referred to as petitioners or Adolph and Janet), are husband and wife, whose legal address was Rockford, Mich., as of the date their petition was filed with the Tax Court. Their joint Federal income tax returns for the taxable years 1964, 1965, and 1966 were filed on the cash basis with the district director of internal revenue at Detroit, Mich.

On February 5, 1959, petitioners executed a partnership agreement pursuant to the Michigan Limited Partnership Statutes, wherein they created a limited partnership known as A. K. Co. The certificate of limited partnership filed with the Clerk of Kent County, Mich., characterized the business to be transacted as follows:

To engage in any kind of commercial, industrial or mercantile enterprise, including, but not by way of limitation, to manufacture, produce, acquire, own, hold, rent, lease, sell, service otherwise dispose of or deal in, goods, wares and merchandise of every kind and description and any class or kind of property that is or may become the subject of trade or commerce; to purchase, own, lease, exchange, improve, develop, deal in mortgage and pledge any and all real and personal property of every kind and nature, including rights, interests, franchises, licenses, privileges, patents, designs, processes and inventions; to acquire by purchase, subscription, contract or otherwise, and to hold, sell, exchange, mortgage, pledge or otherwise dispose of and deal in all forms of securities, including shares, stocks, bonds, debentures, notes, mortgages, evidences of indebtedness and certificates of interest by whomsoever issued; to act in any and all parts of the world in any capacity whatsoever as financial or business agent or representative, general or special; and to do all other acts and things incidental to or in the aid of any of the objects or purposes of this partnership.

The petitioners' capital contribution to A. K. Co. consisted of the following jointly held property.

2 apartment buildings,
18 shares Consumers Power Co., pref. 4.5%
92 shares Sears, Roebuck & Co.
75 shares Standard Oil of Indiana
15 shares Standard Oil of New Jersey
315 shares U.S. Steel Corp.
53 shares Dexter Industries, Inc.
17,965 shares Wolverine Shoe & Tanning Corp. (now Wolverine World Wide, Inc.)

The partnership books reflected a total capital contribution of $171,643.66 allocated as follows:

*General partners*

| | |
|---|---|
| Adolph K. Krause | $34,328.73 |
| Janet S. Krause | 34,328.73 |

*Limited partners*

Adolph K. Krause_____ $102, 985. 20

Janet S. Krause_____ 1. 00

Petitioners agreed to allocate 40 percent of the net profits to the general partnership interest and 60 percent to the limited partnership interest. The 40-percent interest was divided equally between both petitioners while the 60-percent limited partnership interest was allocated solely to Adolph.

In reference to the limited partnership interest, the certificate of limited partnership stated, in part:

### VIII.

There is no agreed time when the contributions of the limited partners are to be returned.

### X.

The interests of all of the limited partners herein may be transferred on the approval of the general partners to accept a new assignee as a limited partner.

Contemporaneous with the execution of this partnership agreement, petitioners on February 5, 1959, created six trusts for the benefit of their children and grandchildren. Adolph entered into a trust agreement between himself and Old Kent Bank & Trust Co. and Sidney A. Veltman as cotrustees, creating three trusts: The Janice K. Ziegler Trust for the benefit of Janice K. Ziegler; the Shirley K. Brackett Trust for the benefit of Shirley K. Brackett; and the Jack A. Krause Trust for the benefit of Jack A. Krause (hereinafter referred to as the children's trusts). The trusts were each funded with $100 in cash and 50 shares of Wolverine Shoe & Tanning Corp. (hereinafter sometimes referred to as Wolverine).

Janet also executed a trust agreement creating three trusts: The Janice K. Ziegler's Children's Trust for the benefit of the children of Janice K. Ziegler; the Shirley K. Brackett's Children's Trust for the benefit of the children of Shirley K. Brackett; and the Jack A. Krause's Children's Trust for the benefit of the children of Jack A. Krause (hereinafter referred to as the grandchildren's trust). Jack A. Krause had no children at the time of the creation of the above-noted trust. Janet named the same trustees as had been selected by her husband. The trusts were each funded with $100 in cash and 25 shares of Wolverine.

The express provisions of each trust executed by the respective petitioners provided in pertinent part, as follows:

### 3. Beneficiaries of the Trusts

(a) * * *

The Trustees shall hold, invest and reinvest the principal of each such Trust and may accumulate the income therefrom, add the same to principal, or retain

it as undistributed income, or may pay the same or any part thereof, at such times and in such manner * * * and in such shares * * * as the Trustees shall determine, in their sole and absolute discretion * * * to or for the benefit of each such first life beneficiary of each respective Trust, or to such first life beneficiary's spouse * * * or to the issue of such first life beneficiary or to any other issue of the Grantor.

(e) The Grantor hereby expressly disclaims and waives any and all interest in and control over the Trusts, or the property thereof, for himself and for his estate.

*      *      *      *      *      *      *

## 5. Powers of Trustees

(n) To terminate in whole or in part, any or all of such Trusts, at any time after the expiration of a period of twelve (12) years, commencing on the date the Trusts herein are created, and upon such termination, to pay the principal accumulations and unpaid income thereof to the then life beneficiary, if living; or if such first life beneficiary be dead, to the then living issue of such first life beneficiary; or if there be no such issue then living, in equal shares to the first life beneficiaries of the other Trusts, or if either of such first life beneficiaries be dead, to such deceased first life beneficiary's issue then living; or if there be no such issue then living, to the surviving first life beneficiary, or if such life beneficiary also be dead, to his or her issue then living; if all of such first life beneficiaries and their respective issue be dead, to those who would take the Grantor's personal property under the laws of Michigan then in force had the Grantor died intestate.

*      *      *      *      *      *      *

Notwithstanding the foregoing, my Trustees shall also have the power in their sole and absolute discretion to make any such payment of principal and accumulated income upon termination hereunder to the * * * [spouse] of the Grantor if she [or he] be then living * * *.

## 7. Powers of Invasion of Principal

[O]r, if in the judgment of my Trustees, the principal of such Trust is needed for the care, comfort, and necessities of the Grantor's * * * [spouse], or for sickness or for emergencies of any nature whatsoever occurring to the Grantor's * * * [spouse], the beneficiaries of the Trusts, or their families, it shall become the duty of the Trustees to devote so much of the income, and if necessary, the principal of such Trust funds as may be required for the use of such person or persons and for such purpose or purposes, in the discretion of the Trustees. * * *

*      *      *      *      *      *      *

## 13. No Power of Revocation

The Trusts herein created shall be irrevocable. The Grantor intends by this instrument to divest himself of all rights, title and interest in the property herein given to the Trustees.

*      *      *      *      *      *      *

## 15. Resignation, Removal and Appointment of Trustees

(b) My * * * [spouse] * * * shall have the power to remove any Trustee * * *.

*      *      *      *      *      *      *

(d) I request that there always be at least two (2) Trustees hereof, and any successor Trustee shall be appointed by the Court of Chancery of Kent County, Michigan, provided, that neither I, my wife, nor any beneficiary of such Trusts shall be appointed a Trustee.

Simultaneous with the execution of the above-mentioned documents, Adolph and the cotrustees executed four additional contracts captioned "Agreement," "Bill of Sale," "Escrow Agreement," and a second "Bill of Sale." [1] These four documents contracted for the sale of Adolph's 60-percent limited partnership interest in A. K. Co. to the six trusts created by him and his wife.

Each "Agreement" provided for the transfer by Adolph of 15 percent of his limited partnership interest to each of the children's trusts and 5 percent of his limited partnership interest to each of the grand-children's trusts in return for the payment of $100 in cash by each trust and 80 percent of the income distribution the trusts were to receive, for a period of 16 years, from their newly acquired interest in A. K. Co.[2] Payments were to be made on March 31 of each year. The transfer was subject to a lien in favor of Adolph in case of default by any of the newly created trusts.

The "Bill of Sale" executed by Adolph, conveyed the appropriate limited partnership interest to each of the six trusts.

The "Escrow Agreement," executed to implement the lien, provided for the depositing by the trustees of the newly acquired partnership interest as collateral to secure the performance of the conditions contained within the "Agreement." It provided in part:

2. In the event Trustees shall fail to make the payments, * * * as provided in the agreement * * * for a period of sixty (60) days after due date, then Krause, at his discretion and election, by delivering to Escrowee the written notice, may declare the aforesaid agreement null and void and thereby cause Escrowee to deliver to him the Bill of Sale deposited hereunder, in which event the transfer of said partnership interest to Krause shall be deemed complete, and any amounts which may have been paid to Krause by Trustees under said agreement shall be deemed forfeited.

3. Unless and until notice shall be given to Escrowee as provided in Paragraph 2 hereof, such transfer evidenced by the Bill of Sale executed pursuant to Paragraph 2 shall be deemed incomplete and ownership of such partnership interest shall be and remain in Trustees.

The second "Bill of Sale" merely reconveyed legal title in the limited partnership to Adolph. This document was deposited with the escrowee to hold until, either payment had been completed, or the trustees defaulted on the contract.

---

[1] Each of the four documents were executed six times, covering all six trusts.

[2] Eighty-percent income distributions calculated after reduction for expenses, trustees' fees, taxes, and distributions to beneficiaries up to 25 percent of trust income. No distributions were made to the beneficiaries prior to or during the years here in issue.

Immediately following the sale, on February 5, 1959, petitioners executed a certificate of amendment to the certificate of limited partnership of A. K. Co. It provided, in part:

The partners shall share in the net profits of the company in the following proportions:

| General partners Name | Amount (percent) |
|---|---|
| (1) Adolph Krause | 20 |
| (2) Janet S. Krause | 20 |

| Limited partners Name | Amount (percent) |
|---|---|
| (1) Janice K. Ziegler Trust | 15 |
| (2) Shirley K. Brackett Trust | 15 |
| (3) Jack A. Krause Trust | 15 |
| (4) Janice K. Ziegler's Children's Trust | 5 |
| (5) Shirley K. Brackett's Children's Trust | 5 |
| (6) Jack A. Krause Children's Trust | 5 |

The income of the six trusts for the years here in issue totaled $153,611.40 divided as follows:

| Year ended | Dividends | Interest | A. K. Co. | Total |
|---|---|---|---|---|
| 1/31/65 | $667.80 | $210.03 | $39,745.95 | $40,623.78 |
| 1/31/66 | 925.80 | 712.50 | 46,594.95 | 48,233.25 |
| 1/31/67 | 1,091.70 | | 63,662.67 | 64,754.37 |

A. K. Co. actually distributed a total of $126,000 to the six trusts for the years here in issue. Eighty percent of this figure reduced by expenses and taxes was required to be distributed to Adolph as payment for the limited partnership interest. These figures may be demonstrated as follows:

| Year distribution applicable to | Distribution from A. K. Co. | Expenses | Taxes | 80 percent of distribution less expenses and taxes |
|---|---|---|---|---|
| 1964 | $21,000 | $510 | $7,116 | $10,699 |
| 1965 | 45,000 | 510 | 10,140 | 27,432 |
| 1966 | 60,000 | 570 | 15,015 | 35,532 |

The trustees made payments to Adolph pursuant to the "Agreement" in the amounts noted above. However, the trustees failed to make these payments within the time permitted in the "Agreement." At no time did Adolph deliver written notice or declare a default as provided in the escrow agreement.

The gross income reported by A. K. Co. for the years here in issue totaled $250,005.95. Of this amount $231,282.63 represented dividends

received from corporate stock. Two hundred twenty-four thousand dollars of the total dividends received were distributed by Wolverine. As of January 1, 1964, A. K. Co. held 80,000 shares of Wolverine. It received an additional 20,000 shares in 1964 and an additional 100,000 shares in 1965 as the result of stock splits.

Wolverine is an outgrowth of a partnership begun by the Krause family in 1883. As of March 19, 1965, the Krause family owned 43.6 percent of the outstanding shares of Wolverine, the largest single stock interest in the company. Adolph was a member of the board of directors and president during all years pertinent hereto.

The possibility that the trustees of the children's and grandchildren's trusts will exercise any powers contained in the trusts on behalf of either petitioner is remote.

### OPINION

On February 5, 1959, petitioners executed a partnership agreement wherein they formed a limited partnership known as A. K. Co. Contemporaneously, petitioners created six trusts; Adolph created three trusts naming their children as beneficiaries, and Janet created three trusts naming their granchildren as beneficiaries. Simultaneous with the execution of the above-noted documents, Adolph executed a series of agreements wherein he agreed to transfer his 60-percent limited partnership interest in A. K. Co. to the six trusts for $100 cash and 80 percent of the income received by the trusts from A. K. Co. for a period of 16 years. Fifteen percent of the limited partnership interest was allocated to each of the three children's trusts and 5 percent was allocated to each of the three grandchildren's trusts. The first issue presented for our determination is whether the trusts are bona fide partners in the limited partnership under section 704(e), I.R.C. 1954,[3] which states in part:

SEC. 704(e). FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

\*        \*        \*        \*        \*        \*        \*

(3) PURCHASE OF INTEREST BY MEMBER OF FAMILY.—For purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trusts for the primary benefit of such persons.

---

[3] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

It is apparent that the capital interest possessed by the six trusts in A. K. Co. was a material income-producing factor; the income reported by the partnership consisted of rents and dividends, both of which were derived from capital investment and not the personal services of the partners.

This decision does not however fully answer the issue before us. The House Ways and Means Committee in discussing the effect of sections 191 and 3797(a)(2), I.R.C. 1939, enacted in 1951, the predecessors of section 704(e), stated in part:

Your committee's amendment makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner. If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford* (309 U.S. 351). \* \* \*

It is therefore manifest from the above language that though a person possesses a capital interest in a partnership in which capital is a material income-producing factor, he will not be recognized as a partner unless he is determined, from all of the facts and circumstances, to be the true owner of such interest.[4] See *Kuney* v. *Frank*, 308 F. 2d 719 (C.A. 9, 1962), *Emil Morton*, 46 T.C. 723 (1966) ; *Mathew J. Spiesman, Jr.*, 28 T.C. 567 (1957), affd. 260 F. 2d 940 (C.A. 9, 1958). It is

---

[4] Sec. 1.704-1(e)(1)(iii). *Requirement of complete transfer to donee.* A donee or purchaser of a capital interest in a partnership is not recognized as a partner under the principles of section 704(e)(1) unless such interest is acquired in a bona fide transaction, not a mere sham for tax avoidance or evasion purposes, and the donee or purchaser is the real owner of such interest. To be recognized, a transfer must vest dominion and control of the partnership interest in the transferee. The existence of such dominion and control in the donee is determined from all the facts and circumstances. A transfer is not recognized if the transferor retains such incidents of ownership that the transferee has not acquired full and complete ownership of the partnership interest. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) *Basic tests as to ownership.* \* \* \* (ix) *Donees as limited partners.* The recognition of a donee's interest in a limited partnership will depend, as in the case of other donated interests, on whether the transfer of property is real and on whether the donee has acquired dominion and control over the interest purportedly transferred to him. \* \* \* If the limited partner's right to transfer or liquidate his interest is subject to substantial restrictions (for example, where the interest of the limited partner is not assignable in a real sense or where such interest may be required to be left in the business for a long term of years), or if the general partner retains any other control which substantially limits any of the rights which would ordinarily be exercisable by unrelated limited partners in normal business relationships, such restrictions on the right to transfer or liquidate, or retention of other control, will be considered strong evidence as to the lack of reality of ownership by the donee.

this theory which respondent applied in attempting to tax petitioners rather than the trusts on the income of A. K. Co.

After considering all of the factors in this case we are convinced respondent was correct in holding the trusts not the real owners of the partnership interest for income tax purposes; the donors retained too many incidents of ownership.

The partnership agreement prevented the trustees from assigning or disposing of the trusts' interest in the partnership without petitioners' consent. It was uncertain if the contributions of the limited partners would ever be returned. Each petitioner had the right to remove the trustees of the trust created by the other. Thus, each petitioner had, for all practical purposes, the right to require the trustees to distribute income and, at the end of 12 years, the principal of the trust created by the other spouse. Adolph was to receive 80 percent of the income distributed by the partnership to the trusts. The trustees failed to pay the agreed 80 percent of distributed partnership income within the specified time period thereby permitting Adolph to revoke the entire sales agreement and reacquire the partnership interest. The reason for the late payment was apparently due to late distribution by the partnership. Such distributions were controlled by petitioners as general partners, i.e., petitioners had the power to maintain or void the entire transaction. Lastly, we note that the major source of A. K. Co.'s income was received as dividends from its holding in Wolverine. Adolph was president and director of Wolverine and he and his family controlled 43 percent of its outstanding stock. It therefore seems apparent that the income received by A. K. Co. and, in turn, distributed to the trusts was controlled by Adolph. See *Toor* v. *Westover*, 200 F. 2d 713 (C.A. 9, 1952); *Kuney* v. *Frank, supra; Roy C. Acuff*, 35 T.C. 162 (1960); *Henry S. Reddig*, 30 T.C. 1382 (1958); *Fred M. Harvey*, 21 T.C. 1020 (1954), and *Leeb* v. *Jarecki*, 156 F. Supp. 6 (N.D. Ill. 1957).

We of course realize that a power to remove a trustee, or the bootstrap sale of a property interest,[5] or the ability to rescind a transaction due to nonpayment does not require an unfavorable determination. See Income Tax Regs., sec. 1.674(d)-2(a); *Commissioner* v. *Brown*, 380 U.S. 563 (1965). However, these factors taken together, along with the others enumerated above, clearly indicate the overwhelming power and authority retained by petitioners. In short, they retained a present income interest and reserved the right to reacquire the principal interest.

---

[5] Note however sec. 704(e)(3) treats all purchases between family members as gifts.

Petitioners contend however that their failure to void the transaction and reacquire the partnership interest demonstrates the petitioners' good faith and the true substance of the transaction. In addition they note that due to their strong financial position there would be no occasion when petitioners would consider reacquiring the partnership interest, further indicating the validity of the transaction.

We cannot agree. As the Supreme Court stated in *Corliss* v. *Bowers*, 281 U.S. 376, 378 (1930):

income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not.

Further, in *Estate of Spiegel* v. *Commissioner*, 335 U.S. 701, 705 (1949), the Supreme Court noted:

it is immaterial whether such a present or future interest, absolute or contingent, remains in the grantor because he deliberately reserves it or because, without considering the consequences, he conveys away less than all of his property ownership and attributes, present or prospective. In either event the settlor has not parted with all of his presently existing or future contingent interests in the property transferred.

See also *Commissioner* v. *Lester*, 366 U.S. 299 (1961); cf. *Pacific Coast Music Jobbers, Inc.*, 55 T.C. 866 (1971).

Upon an examination of the entire record we conclude that the petitioners were the true owners of the limited partnership interest, and therefore the income attributable to such interest is taxable to them.

Having determined that the trusts are not the true owners of the partnership interest, it would seem unnecessary to consider the merits of the second issue. However, as the facts indicate, the six trusts held an insignificant amount of additional property which produced dividend and interest income. We therefore are required to decide whether petitioners are taxable on this income. This necessitates that we determine (a) if the reciprocal-trust doctrine is applicable to the instant case and, if the answer be in the affirmative, (b) whether the trusts are controlled by the grantor trust provisions.

Respondent contends that the reciprocal-trust doctrine is applicable to the instant case and therefore each petitioner is considered to be the grantor of the trust created by his or her spouse. Petitioners on the one hand assert that the reciprocal-trust doctrine is inapplicable to the present set of facts, but even if determined to be applicable, it does not cause petitioners to be taxed on the trust income as the grantor trust provisions have not been violated.

We agree with respondent. The Supreme Court in *United States* v. *Estate of Grace*, 395 U.S. 316 (1969), in affirming the validity of the

reciprocal-trust doctrine in the estate tax area, specifically section 2036(a)(1), stated: [6]

we hold that application of the reciprocal trust doctrine is not dependent upon a finding that each trust was created as a *quid pro quo* for the other. Such a "consideration" requirement necessarily involves a difficult inquiry into the subjective intent of the settlors. Nor do we think it necessary to prove the existence of a tax-avoidance motive. As we have said above, standards of this sort, which rely on subjective factors, are rarely workable under the federal estate tax laws. Rather, we hold that application of the reciprocal trust doctrine requires only that the trusts be interrelated, and that the arrangement, to the extent of mutual value, leaves the settlors in approximately the same economic position as they would have been in had they created trusts naming themselves as life beneficiaries.[7] [395 U.S. at 324. Footnote omitted.]

Further, this doctrine has been held to apply to the income tax as well as the estate tax area. See *Estate of Newberry*, 17 T.C. 597 (1951), revd. 201 F. 2d 874 (C.A. 3, 1953), on the facts but not on the above-noted principle of law; *Margaret Batts Tobin*, 11 T.C. 928 (1948), reversed in part 183 F. 2d 919 (C.A. 5, 1950), on the facts but not on the principle of law; *Henry F. Haldeman*, 6 T.C. 345 (1946); *Werner A. Wieboldt*, 5 T.C. 946 (1945); *Purdon Smith Whiteley*, 42 B.T.A. 316 (1940).

The trusts in the instant case were interrelated; all were created on the same day, named the same trustees and contained identical provisions. The primary beneficiaries were the natural objects of the grantors' bounty. However, each trust contained provisions permitting the trustees to pay the accumulated income and corpus to the grantor's spouse. It is therefore apparent that, though petitioners mutually desired to make provision for their children and grandchildren, they did not wish such provision to separate them irrevocably from financial security. Hence the "crossed" power to aid each other. As a result they maintained the same economic position throughout the entire transaction. As the Second Circuit stated in *Lehman* v. *Commissioner*, 109 F. 2d 99, 100 (C.A. 2, 1940), affirming 39 B.T.A. 17 (1939), the case which initiated the reciprocal-trust doctrine:

The fact that the trusts were reciprocated or "crossed" is a trifle, quite lacking in practical or legal significance.

---

[6] See also *Estate of Spiegel* v. *Commissioner*, 335 U.S. 701, 705 (1949), wherein the Supreme Court stated:

"In the *Church* case we stated that a trust transaction cannot be held to alienate all of a settlor's 'possession or enjoyment' under * * * [sec. 2036] unless it effects a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property. After such a transfer has been made, the settlor must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the property then or thereafter. * * *' "

[7] The required life-beneficiary status would seem to be included so as to meet the requirements of sec. 2036(a)(1). No such requirement is contained in the grantor trust provisions.

Petitioners however contend that section 671 which states in part:

No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 (relating to definition of gross income) or any other provision of this title, except as specified in this subpart.

precludes the applicability of the reciprocal-trust doctrine to the grantor trust provisions. Further, they argue that section 677(a) which provides:

SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust * * * whose income * * * may be—

(1) distributed to the grantor or the *grantor's spouse;*

(2) held or accumulated for future distribution to the grantor or the *grantor's spouse;* or

(3) applied to the payment of premiums on policies of insurance on the life of the grantor or the *grantor's spouse* * * *. [Emphasis supplied.]

closes the "loophole" present in the instant case. Petitioners point out however that such language was added with the enactment of the "69 Tax Reform Act," after the taxable years in question.

We cannot agree with either argument. First, section 671 merely precludes the applicability of any other section in taxing the grantor on the income of the trust. It does not prevent the use of the reciprocal-trust doctrine. As will be seen *infra,* the reciprocal-trust doctrine is applied only so that this Court can determine whether in fact petitioners are taxable under the grantor trust provisions. Secondly, Congress in amending section 677 to include grantor "or the grantor's spouse" clearly was not attempting to deal with a reciprocal trust.[8] Rather, as we noted above, the courts first disposed of this issue in *Lehman* v. *Commissioner, supra,* a decision promulgated in 1940. The addition of the term "spouse" merely contemplated a situation wherein "*a* trust [is] created by *a* taxpayer for the benefit of his spouse." (Emphasis supplied. H. Rept. No. 91-413 (Part 1), 91st Cong., 1st Sess., p. 97 (1969), 1969-3 C.B. 261)

Having determined the applicability of the reciprocal-trust doctrine, thereby treating each petitioner as the grantor of the trust created by his or her spouse, we must now decide whether any portion of the grantor trust provisions is applicable so as to tax petitioners on the income of the trust.

Respondent asserts that, pursuant to sections 677, 676, or 674, petitioners are to be treated as the owners of the trusts. We need look no further than section 677(a)(2), which provides as follows:

SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion

---

[8] The reciprocal-trust doctrine covers not only husband and wife, but brother and sister, parent and child, and very possibly two complete strangers.

of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

\*      \*      \*      \*      \*      \*      \*

> (2) held or accumulated for future distribution to the grantor or the grantor's spouse; or

In the case before us the pertinent parts of the trust agreements provided that the trustees, nonadverse parties,[9] could accumulate the trust income; they could terminate the trust after 12 years, and the trustees could then pay all accumulated income and corpus back to petitioners. Such circumstances require application of section 677(a)(2). *Ralph L. Humphrey*, 39 T.C. 199 (1962).

Petitioners contend however that the last sentence of section 677(a) renders section 677(a)(2) impotent on the present set of facts. It states:

SEC. 677(a). \* \* \* This subsection shall not apply to a power the exercise of which can only affect the beneficial enjoyment of the income for a period commencing after the expiration of a period such that the grantor would not be treated as the owner under section 673 if the power were a reversionary interest but the grantor may be treated as the owner after the expiration of the period unless the power is relinquished.

This same contention was raised in *Ralph L. Humphrey, supra*. The Tax Court in rejecting petitioners' argument affirmed the rationale applied by respondent in its regulations. It is therein provided:

The exception set forth in the last sentence of section 677(a) does not apply merely because the grantor must await the expiration of a period of time before he can receive or exercise discretion over previously accumulated income of the trust, even though the period is such that the grantor would not be treated as an owner under section 673 if a reversionary interest were involved. Thus, if income (including capital gains) of a trust is to be accumulated for 10 years and then will be, or at the discretion of the grantor may be, distributed to the grantor, the grantor is treated as the owner of the trust from its inception. [Sec. 1.677(a)-1(f), Income Tax Regs.]

Following the decision in *Humphrey*, we also reject petitioners' contention.

Having determined that petitioners, through the application of the reciprocal-trust doctrine and grantor trusts provisions, are taxed on the income of the trusts, we must now decide to what extent they must be taxed. The Supreme Court in *United States* v. *Estate of Grace*,

---

[9] SEC. 672. DEFINITIONS AND RULES.

(a) ADVERSE PARTY.—For purposes of this subpart, the term "adverse party" means any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust. \* \* \*

(b) NONADVERSE PARTY.—For purposes of this subpart, the term "nonadverse party" means any person who is not an adverse party.

*supra*, held that the petitioner would be required to include in the deceased's estate, the value of the trust created by his spouse, "to the extent of mutual value," 395 U.S. at 324. In *Cole's Estate* v. *Commissioner*, 140 F. 2d 636 (C.A. 8, 1944), deceased and his spouse created trusts for the benefit of each other. However, deceased funded his trust with 700 shares of stock while his spouse contributed only 300. The Eighth Circuit held that petitioner was required to include the fair market value of 300 shares of stock, the mutual value. Compare *Estate of Laura Carter*, 31 T.C. 1148 (1959).

In the instant case the three trusts created by Adolph were funded with $100 and 50 shares of Wolverine, while Janet's trusts contained $100 and only 25 shares of Wolverine. Therefore, following the rationale of *Grace*, petitioners are taxed to the extent of the income produced by 25 shares of Wolverine held by each of the six trusts.

We note in passing that had we in fact determined the trusts to be the true owners of the limited partnership interest, thereby relieving petitioners from liability under the auspices of section 704, they would still be subject to tax under the reciprocal-trust doctrine and grantor trust provisions enunciated immediately above.

*Decision will be entered under Rule 50.*